No. 120,935

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

O. GENE BICKNELL and O. GENE BICKNELL
as Administrator of the Estate of RITA J. BICKNELL,
*Appellees*,

v.

KANSAS DEPARTMENT OF REVENUE,
*Appellant*.

SYLLABUS BY THE COURT

1.

The determination of which party shall bear the burden of proof is a question of law, and, therefore, an appellate court's review is unlimited.

2.

The party contending that the agency's action is invalid bears the burden of proving the invalidity.

3.

The burden of persuasion is the ultimate burden assigned to a party who must prove something to a particularized degree of certainty. A party meets this burden by convincing the fact-finder to view the facts in a way that favors that party.

4.

The burden of proving a disputed fact or issue rests upon the parties asserting the burden of proof, or having the affirmative of the issue, and remains with them throughout

the trial. The necessity of offering evidence to offset an adversary's prima facie case in no way shifts the burden of proof, which continues to rest upon the parties who have the burden of proof.

5.

An appeal from a decision of the Board of Tax Appeals shall be heard de novo as required by K.S.A. 74-2426(c)(4)(B) and shall include an evidentiary hearing at which issues of law and fact shall be determined anew.

6.

The failure to hold a party to its burden of proof is reversible error.

Appeal from Crawford District Court; RICHARD M. SMITH, judge. Opinion filed March 12, 2021. Affirmed in part, reversed in part, and remanded with directions.

*James D. Oliver*, of Foulston Siefkin LLP, of Overland Park, *Jeffery A. Jordan*, of the same firm, of Wichita, and *Jeremy L. Graber*, of the same firm, of Topeka, for appellant.

*Jay E. Heidrick* and *Miriam E. C. Bailey*, of Polsinelli P.C., of Kansas City, Missouri, and *R. Dan Boulware*, pro hac vice, of the same firm, of St. Joseph, Missouri, for appellees.

Before ARNOLD-BURGER, C.J., GREEN and POWELL, JJ.

GREEN, J.: This is an appeal from a Board of Tax Appeals (BOTA) decision. The primary dispute in this appeal is whether Gene Bicknell was domiciled in Kansas for the tax years of 2005 and 2006. Gene contends that he was domiciled in Florida during this time. On the other hand, the Kansas Department of Revenue (KDOR) maintains that Gene was domiciled in Kansas for the tax years of 2005 and 2006. The district court, however, ruled that Gene was domiciled in Florida during these tax assessment periods of 2005 and 2006.

On appeal, KDOR presses three basic contentions that we need to address based on our holding in this appeal. First, KDOR argues that the district court improperly shifted the burden of proof onto it to prove Gene was not domiciled in Florida for the tax assessment periods of 2005 and 2006. We agree. Second, KDOR argues that the district court erred when it conducted a true trial de novo. We disagree. Third, KDOR argues that Crawford County was not a proper venue for this action. We agree. Thus, we affirm in part, reverse in part, and remand for a new trial with directions that the trial be conducted in Shawnee County, Kansas. And because we are reversing, we need not consider KDOR's remaining arguments.

In September 2007, KDOR initiated a desk review of Gene Bicknell's 2005 and 2006 income tax returns, which he had filed as nonresident returns. As part of its investigation, KDOR sent Gene a nonresident questionnaire and requested documents from Gene and his wife, Rita Bicknell. When KDOR concluded its review in January 2009, it concluded that Gene should have filed as a Kansas resident. The consequence was a tax bill, including interest and penalties, of $41,069,305.00.

The Bicknells appealed the assessment and argued that Gene was a resident of Florida during the assessment period. KDOR denied this appeal in a written final determination in October 2010. Then the Bicknells appealed to the Court of Tax Appeals (COTA) where they were again unsuccessful in challenging the residency decision.

Two Kansas regulations defining domicile were effective during the assessment periods of 2005 and 2006. K.A.R. 92-12-4 (2006) provided a simple, three-part explanation of domicile. This regulation was revoked on March 24, 2006, and replaced by K.A.R. 92-12-4a. The new regulation was far more detailed and lists many factors that courts can consider in determining a person's domicile. The Bicknells challenged the

3

constitutionality of K.A.R. 92-12-4a and its application to their case before COTA and in another case docketed in the Shawnee County District Court. See *Bicknell v. Jordan*, No. 109,720, 2014 WL 1302634 (Kan. App. 2014) (unpublished opinion) (*Bicknell I*). Nevertheless, the Bicknells' argument failed before both COTA and the district court. 2014 WL 1302634, at *1-2. The Bicknells appealed the district court's dismissal to this court. This court affirmed the district court, holding that the Bicknells had failed to exhaust their administrative remedies in the COTA proceedings before bringing their constitutional challenge to this court. 2014 WL 1302634, at *9.

While the case was pending in this court, COTA held a six-day trial. On December 3, 2013, COTA issued its decision and affirmed KDOR's tax assessment. In its decision, COTA discussed the two domicile regulations, K.A.R. 92-12-4 and K.A.R. 92-12-4a, which were effective during the assessment periods of 2005 and 2006. COTA stated that both the previous and current "regulations set out, with differing degrees of specificity, administrative guidance regarding domicile determinations in Kansas income tax controversies." COTA determined that the newer regulation was "merely a detailed reflection of existing statutory and case law." Then, COTA stated:

> "Therefore, we place no particular reliance for our decision herein on the former
> regulation or (except as expressly noted immediately hereafter) on the current regulation.
> We rely instead on Kansas statutory law and case law, including the recapitulation of the
> common law contained in the Restatement (Second) of Conflict of Laws as approved in
> [*In re Estate of Phillips*, 4 Kan. App. 2d 256, 604 P.2d 747 (1980)]. The only provision
> of the current regulation that we expressly implement and apply in this decision is K.A.R.
> 92-12-4a(b)(8). It excludes from consideration 'the location of any organization to which
> the person makes charitable contributions [or] the location of any charitable organization
> for which the person serves as a board member, committee member, or other volunteer.'
> *Id.* Based on that provision, we do not consider, and have not considered, in our
> determination any evidence relating to the location of Taxpayers' charitable contributions
> or charitable service (as a board member, committee member, or other volunteer)."

4

Following this decision, the Bicknells appealed once again to this court. *In re Bicknell*, No. 111,202, 2015 WL 5613069 (Kan. App. 2015) (unpublished opinion) (*Bicknell II*). The Bicknells argued that COTA erred by relying on a common-law approach rather than KDOR's published regulations. In agreeing, this court vacated COTA's decision because COTA had "ignored and failed to apply the [KDOR]'s regulations in determining the issue of Gene's domicile," and remanded the case to COTA for readjudication consistent with this court's opinion. 2015 WL 5613069, at *10. This court directed COTA to "consider K.A.R. 92-12-4 and K.A.R. 92-12-4a along with controlling statutory law and caselaw in determining Gene's tax-residency status for the years 2005 and 2006." 2015 WL 5613069, at *10. A dissenting opinion was filed, stating the following: that COTA correctly applied the law "if not in form, then in substance." 2015 WL 5613069, at *10 (Powell, J., dissenting).

In 2014, the Kansas Legislature replaced COTA with BOTA. L. 2014, ch. 141, § 1; K.S.A. 2014 Supp. 74-2426. Thus, BOTA considered this court's mandate on remand. The same 2014 legislation allowed BOTA to issue summary decisions and created an option for aggrieved parties to request that BOTA issue a full and complete opinion explaining its decision. L. 2014, ch. 141, § 1; K.S.A. 2014 Supp. 74-2426(a).

BOTA issued a written summary decision on October 2, 2017. BOTA held: "After application of the applicable KDOR regulations, statutes and caselaw, to the record evidence, pursuant to the instructions of the Kansas Court of Appeals" that the Bicknells failed to satisfy their burden of proving that Gene was domiciled in Florida during the assessment period. The Bicknells did not request a full and complete opinion be issued by BOTA under K.S.A. 74-2426(a).

5

The 2014 amendment to K.S.A. 74-2426 also established a new method of appeal from BOTA orders. The amended statute provided the following:  "Any aggrieved person has the right to appeal any final order of the board issued after June 30, 2014, by filing a petition with the court of appeals or the district court. Any appeal to the district court shall be a trial de novo." L. 2014, ch. 141, § 1; K.S.A. 2014 Supp. 74-2426(c)(4)(A).

In 2016, the statute was amended again by Senate Bill 280 (S.B. 280). L. 2016, ch. 112, § 3; K.S.A. 2016 Supp. 74-2426. The new language stated:

> "At the election of a taxpayer, any summary decision or full and complete opinion of the board of tax appeals issued after June 30, 2014, may be appealed by filing a petition for review in the district court. Any appeal to the district court shall be a trial de novo. Notwithstanding K.S.A. 77-619, and amendments thereto, the trial de novo shall include an evidentiary hearing at which issues of law and fact shall be determined anew." L. 2016, ch. 112, § 3; K.S.A. 2016 Supp. 74-2426(c)(4)(B).

S.B. 280 and its interpretation and application would be the subject of considerable dispute by the parties before the district court.

The Bicknells filed a petition for judicial review with the district court of Crawford County in November 2017. The case proceeded to an eight-day trial. The district court issued a 53-page opinion ruling in favor of the Bicknells and ruling that Gene's domicile was Florida during the assessment period.

*Did the District Court Erroneously Shift the Burden Onto KDOR to Disprove the Bicknells' Florida Domicile?*

"The determination of which party shall bear the burden of proof is a question of law, and, therefore, this court's review is unlimited." *In re G.M.A.*, 30 Kan. App. 2d 587, 593, 43 P.3d 881 (2002).

The party contending that the agency's action is invalid bears the burden of proving the invalidity. K.S.A. 77-621(a)(1); *Peck v. University Residence Committee of Kansas State University*, 248 Kan. 450, Syl. ¶ 6, 461, 807 P.2d 652 (1991) ("Under K.S.A. 77-621[a][1], the student bears the burden to show that an agency's action is invalid."); see Leben, *Challenging and Defending Agency Actions in Kansas*, 64 J.K.B.A. 22, 29 (June/July 1995) ("K.S.A. 77-621[a][1] provides that the burden of proving the invalidity of agency action is on the party asserting its invalidity. This burden remains with the party opposing the validity of the agency's action for all issues.").

Gene, as the petitioner, has the burden of persuasion to prove by a preponderance of the evidence that Florida was his domicile for the tax years 2005 and 2006. See *In re Tax Appeal of National Catastrophe Restoration, Inc.*, 48 Kan. App. 2d 189, 196-97, 291 P.3d 89 (2012). The burden of persuasion is the ultimate burden assigned to a party who must prove something to a particularized degree of certainty. For example, "A party meets this burden by convincing the fact-finder to view the facts in a way that favors that party. Today the phrase *burden of proof* most often bears this meaning." Garner, A Dictionary of Modern Legal Usage 121 (2d ed. 2001).

The burden of proof continues to rest on the party having the affirmative issue. *Miller v. Kruggel*, 165 Kan. 435, 439, 195 P.2d 597 (1948) ("The burden of proving a disputed fact or issue rests upon the party asserting it, or having the affirmative of the

issue, and remains with him throughout the trial. . . . The necessity of offering evidence to offset an adversary's prima facie case in no way shifts the burden of proof, which continues to rest upon the party which has it."); see *State v. Gonzalez-Sandoval*, 309 Kan. 113, 122, 431 P.3d 850 (2018) ("[T]he burden of persuasion 'rests with, and never shifts from, the opponent.'").

We now address KDOR's argument that the district court's improper shifting of the burden of proof onto it—to disprove Gene's Florida domicile for the tax years of 2005 and 2006—resulted in reversible error. KDOR cites several examples in the district court's final written decision where it shifted the burden onto KDOR to disprove Gene's contentions that he had established a Florida domicile for the tax years 2005 and 2006. For example, in referencing testimony from Gene's friends, family, and business associates, who testified that the Bicknells had left their home in Pittsburg, Kansas, to establish a Florida domicile, the district court stated the following:

> "Despite KDOR's obvious expenditure of considerable resource and effort, the department produced no witnesses who contradicted this testimony. In fact, the KDOR's 'star' witness for the concept of Kansas residency testified that Gene is a celebrity. If that's true and Gene continued to live in Pittsburg, it seems likely that in the last 10 years a witness would develop to testify this is a sham. It is prudent to resist total reliance on the absence of evidence for the proof of anything. Still, this is a deafening silence."

The district court here improperly shifted onto KDOR the burden of proof to do the following: to produce a witness who would testify that Gene was perpetuating a "sham" when he contended that he had left his Kansas domicile to establish a domicile in Florida. As is evident from the quoted language, the district court faulted KDOR for being unable to find such a witness "in the last 10 years" who would testify that Gene had a continuing "sham" going on by maintaining he had established a Florida domicile when in fact he had not. Also, in faulting the KDOR

8

for failing to produce this witness, the district court declared that the absence of such a witness "is a deafening silence."

This constituted an improper shifting of the burden onto KDOR to disprove Gene's domicile in Florida for those previously mentioned tax years. See *Peck*, 248 Kan. at 461 (When "[t]he district court reasoned that the Residence Committee may not draw a negative inference from [a student's] failure to present evidence on a factor," our Supreme Court ruled that this "impermissibly shift[ed] the burden to the Residence Committee to prove nonresident status.").

The district court's final written decision is replete with examples where, rather than hold Gene to his burden to prove his assertion that he had a Florida domicile for the tax years 2005 and 2006 by a preponderance of evidence, the district court improperly shifted the burden onto KDOR to disprove Gene's domicile in Florida for those tax years.

Indeed, KDOR argues that the district court imposed a negative factual finding on it to produce a witness to testify that Gene was engaged in a "sham." As KDOR points out in its brief, "'A negative finding indicates that *the party upon whom the burden of proof is cast* did not sustain the requisite burden, and on appeal the negative finding will not be disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice.'" *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985). KDOR had no burden to produce any witnesses. Also, KDOR correctly argues that "the court erroneously applied a 'negative-findings' test against KDOR, when it did not have the burden of proof."

Another example of the district court's improper burden shifting can also be found in its final written decision. KDOR argues that the district court erroneously placed a heightened fraud burden of proof on it. In the following passage, the district court stated:

"The parties' stipulation that Gene did not intend to commit tax fraud did not totally dissuade KDOR from making suggestions seemingly at odds with this stipulation, insinuated at times during the trial and argued more subtlety in closing arguments. KDOR implied Gene's behavior might place on a morality spectrum somewhere between evasive and unseemly so long as such classification falls short of alleging criminal tax fraud. This is pointed out, not to criticize KDOR, but to acknowledge for the record the court's consideration of KDOR's suggestions of improper intent.

"After processing the evidence relevant to motive, this court concludes throughout the period of 2005, 2006, and the years immediately preceding Gene's motives regarding domicile were sincere. There is no evidence Kansas income tax avoidance was a motivating factor. There is some evidence of inquiring about tax consequences. Gene being oblivious to tax implications is not believable. Nevertheless, there's no evidence of an intentional scheme to move to Florida to avoid the taxes now claimed. Even the implications of the language 'tax avoidance' cast greater negative aspersions on Gene's motives than the evidence warrants. This is not a situation where the evidence supports a design or plan on the part of Gene to purposefully deprive the State of Kansas of revenue to which they were rightfully entitled. To borrow a phrase from equity his 'hands are clean.' If the contrary were true, the court would have been much more likely to construe evidence in favor of KDOR and against Gene when appropriate."

As is evident from this quoted passage, the district court noted KDOR's failure to produce any evidence that Gene was involved in a design or intentional scheme to avoid paying Kansas the true amount of taxes he owed. In noting this failure, the district court "conclude[ed] throughout the period of 2005, 2006, and the years immediately preceding that Gene's motives regarding domicile were sincere" and that "[t]here is no evidence Kansas income tax avoidance was a motivating factor"

10

in Gene's decision to change his domicile to Florida. So the district court ruled that Gene had clean hands. And because of Gene's clean hands, the court stated that it would be unable to "construe evidence in favor of KDOR and against Gene when appropriate." Thus, this was another improper burden shift onto KDOR, requiring it to prove or show that Gene was motivated to change his domicile to Florida for the purpose of avoiding or reducing his Kansas income tax liability for the tax years 2005 and 2006.

Here, the district court's burden shifting is like the burden shifting that occurred in the *Peck* decision. Martin J. Peck, a Kansas State University student, sued the university and the Board of Regents who maintained that he was not a resident of the state for student fee purposes. This residency determination was made by the Residence Commission at K-State.

Before the district court, Peck argued that once his evidence established a prima facie case of residence, the burden then shifted to the Residence Committee to come forward with evidence to refute Peck's residence. The district court agreed and ruled that K-State's action in denying resident status to Peck was not supported by substantial evidence. Then the district court set aside Peck's nonresidence status and granted Peck resident status.

Before our Supreme Court, K-State argued that the district court's ruling erroneously shifted Peck's burden of proof onto the Residence Committee to show Peck's nonresidency. In agreeing that an improper burden shifting had occurred, our Supreme Court stated the following:

> "The district court reasoned that the Residence Committee may not draw a negative inference from Peck's failure to present evidence on a factor. This reasoning impermissibly shifts the burden to the Residence Committee to prove nonresident status.

11

Under K.S.A. 77-621(a)(1), Peck bears the burden to show that the agency's action is invalid." 248 Kan. at 461.

Like *Peck*, the district court here improperly shifted the burden onto KDOR to show that Gene was not domiciled in Florida for the tax years of 2005 and 2006. As KDOR points out in its brief, "KDOR was not required to establish fraudulent intent or the equities of resident income taxes, and no heightened standard of proof could be required to support enforcement of the statutes. In no event did KDOR have the burden of proof. That burden never shifted from the Bicknells."

Nevertheless, the dissent maintains that the *Peck* decision is distinguishable from Gene's case. The dissent contends that the district court's statements about KDOR's lack of evidence here are more analogous to those lack of evidence statements made in *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 75 P.3d 226 (2003) (*BCBS*). There our Supreme Court held that no burden shifting had occurred. 276 Kan. at 274. The facts here are far different from those in *BCBS*. In *BCBS*, BCBS and Anthem Insurance argued that the Kansas Commissioner of Insurance (Commissioner) had improperly shifted the burden of proof onto them. So the dissent argues that this burden shifting in *BCBS* is analogous to what occurred here.

The dissent, however, ignores that the burden shifting that BCBS and Anthem Insurance complained about was being committed by the Commissioner and not by BCBS or Anthem Insurance. Indeed, the Commissioner was pointing out BCBS's and Anthem Insurance's failure to produce sufficient evidence to support their proposed merger request. By contrast, in *Peck* and in Gene's case, we have the student, Peck, and Gene, respectively, shifting the burden of proof onto the agencies: University Residence Committee of Kansas State University and KDOR. This they cannot do. This kind of burden shifting is prohibited under the previously cited authorities and K.S.A. 77-

12

621(a)(1). See Leben, *Challenging and Defending Agency Actions in Kansas*, 64 J.K.B.A. 22, 29 (June/July 1995) ("K.S.A. 77-621[a][1] provides that the burden of proving the invalidity of agency action is on the party asserting its invalidity. This burden remains with the party opposing the validity of the agency's action for all issues.").

In fact, in setting out the burden in *BCBS*, our Supreme Court cited to K.S.A. 77-621(a)(1) and stated the following: "BCBSKS and Anthem, as the petitioners for review to the district court, retain the burden in this court of proving at least one of the above-listed statutory bases of error exists." 276 Kan. at 245. Thus, the dissent's reliance on *BCBS* is misplaced.

Also, KDOR contends that the "most outrageous example of erroneously imposing the burden of proof on KDOR occurred when the district court dived head first into Rita's domicile." KDOR states that the district court "*sua sponte*, disputed *Mrs. Bicknell's* residence, and decided against KDOR for failing to offer proof that she resided in Kansas."

After the district court analyzed the factors under K.A.R. 92-12-4a(b)(7), the court turned to the marital presumption in K.A.R. 92-12-4a(b)(5). This regulation states in part:

> "[T]here shall be a presumption that the place where a person's family is domiciled is that person's domicile. The domicile of a person who is married shall be the same as the person's spouse unless there is affirmative evidence to the contrary, the husband and wife are legally separated, or the marriage has been dissolved. When a person has made a home at any place with the intention of remaining there indefinitely and the person neither lives at the home in which the person's family lives nor intends to do so, then that person shall be deemed to have established a domicile separate from that person's family." K.A.R. 92-12-4a(b)(5).

Rita maintained throughout the case that she did not have a Florida domicile or become a resident until 2008. She explained that she did not declare herself to have a Florida domicile or be a resident, despite physically residing in Florida, so that she could continue to vote and participate in local Kansas politics. In the context of discussing how to apply this presumption, the district court stated the following:

"Whether Rita would pass a scrutiny as intense as the scrutiny of Gene's residence might seem immaterial but it is quite relevant. One thing is certain. Only Rita's desire would weigh in favor of Kansas. No other element of domicile has been sufficiently demonstrated by the evidence. This court is not convinced her domicile during the subject time was Kansas. The evidence suggests it was Florida.

"Admittedly, she has not been the focus of this litigation. The regulation is not specific as to which spouse may control the other. Before the court assigns her spouse's domicile based upon hers *there ought to be some degree of proof she maintained a Kansas residency.* That doesn't exist to the degree necessary to impute it to her spouse. Based on the evidence before this court, considering the parties, their relationship and activities, if one spouse's residency creates a presumption as to the residency of the other, Gene's residency would create a presumption as to Rita's but not the other way around." (Emphasis added.)

KDOR argues that Rita's Kansas domicile was "indisputable," and that the Bicknells had the burden of proving that Gene lived apart from Rita. Indeed, the district court declared in its written decision that "it is undisputed that Rita was domiciled in Kansas until at least 2008." Rita testified that her domicile was in Kansas during this period. Also, the Bicknells did not dispute that Rita was domiciled in Kansas until 2008.

Finally, any doubt on this point about Rita's claimed domicile for the tax years 2005 and 2006 vanishes when the district court declared: "Rita did not become a Florida resident until 2008. Up to this point in time she intended to maintain Kansas residency to

14

maintain her law license and to be able to maintain a more active role in Kansas politics than possible as a non-resident."

To support its position on the improper burden shifting, KDOR explained in its brief the following:

> "Spouses may for various reasons live apart and establish separate domiciles, but they have the burden of proving they live apart. Gene thus had the burden of proof to establish by a preponderance of the evidence, not that Rita lived in Florida (her Kansas residence was an indisputable fact) *but that he lived apart from her*, which he and Rita both denied. Based on this testimony and the presumption that spouses have the same domicile, Gene could not and did not meet the burden by a *preponderance*. Each spouse is likely to share the same residence of the other."

Only Gene's domicile was in dispute. Thus, the burden was on Gene to prove that he had established a domicile separate and *apart* from Rita's Kansas domicile. But he failed to do this. So under the previously referenced presumption, K.A.R. 92-12-4a(b)(5), because Rita and Gene did not consider themselves a married couple, separate and living *apart* in 2005 and 2006, there existed a presumption that Gene's domicile would have been the same as his wife, Rita.

Nevertheless, as is evident from the previously quoted passage of the district court, the court determined that "there ought to be some degree of proof [Rita] maintained a Kansas residency. That doesn't exist to the degree necessary to impute it to her spouse." In explaining the location of Rita's domicile, the district court stated:  "This court is not convinced her domicile during the subject time was Kansas. The evidence suggests it was Florida." Not only was this a startling inconsistency for Rita's claimed domicile for the tax years 2005 and 2006 but also was another example of the district court's improper shifting of the burden onto KDOR to disprove that Rita was domiciled in Florida for

15

those tax years, even though Rita maintained and claimed that she had kept her Kansas domicile until 2008.

Finally, we point out that the district court has come to two conclusions about Rita's domicile which are diametrically opposed to each other. For example, the district court initially determined that Rita's domicile for the tax years 2005 and 2006 was Kansas. Later, with no change in the record facts, the district court determined that Rita's domicile for the previously mentioned tax years was Florida. These two opposing propositions are logically contradictory. Thus, if the first is true, the second is false; if the first is false, the second is true. So these two contradictory propositions are mutually exclusive. The district court here is trying to have two factually incompatible things: to have one's cake and eat it too. But neither the district court nor the dissent explains how Rita can have both a domicile in Kansas and not have a domicile in Kansas for the tax years in question. It is like saying, for example, "*It is both raining and not raining in the same place and at the same time*." This is a logical contradiction in reasoning.

We determine that the placement of the burden of proof is important and that the previous examples of burden shifting are significant. Here, KDOR bears no burden to disprove Gene's domicile in Florida for the tax years 2005 and 2006. On the other hand, the burden of proof or persuasion is on Gene to prove his Florida domicile by a preponderance of the evidence during trial—to support the burden that he alone bears—for the tax years in question. Nevertheless, *the district court* here not only required KDOR to rebut Gene's domicile in Florida for the tax years 2005 and 2006 but *also required KDOR to disprove Gene's and Rita's domicile in Florida for those tax years.* This is improper burden shifting. "The burden of proving a disputed fact or issue rests upon the party asserting it as a basis of his claim and remains with him throughout the trial." *Bowen v. Hathaway*, 202 Kan. 107, 110, 446 P.2d 723 (1968).

Thus, the district court committed a legal error when it shifted the burden of proof onto KDOR to disprove Gene's and Rita's domicile in Florida for the tax years 2005 and 2006. The failure to hold a party to its burden of proof is reversible error. *In re Equalization Appeal of California Crossing*, No. 106,259, 2012 WL 2620997, at *5 (Kan. App. 2012) (unpublished opinion).

*Did the District Court Err by Conducting a True Trial De Novo?*

Throughout the proceedings before the district court, KDOR challenged the way the court interpreted its de novo powers of review under K.S.A. 74-2426. The district court determined, after examining the statute and its history along with Kansas caselaw, that it was required to conduct a completely new trial, without reference to the proceedings below. The court did not allow KDOR to admit the agency record as evidence—all evidence before the court had to be presented again. KDOR argues that the district court's approach failed to properly apply the KJRA.

The KJRA "establishes the exclusive means of judicial review of agency action." K.S.A. 77-606. The KJRA confines judicial review of disputed facts to the agency record and limits the introduction to narrow circumstances not relevant to this appeal. K.S.A. 77-618; K.S.A. 77-619. Nevertheless, there is an exception in the statute providing that judicial review of disputed facts in BOTA orders shall be in accordance with K.S.A. 74-2426. K.S.A. 77-618(f).

K.S.A. 74-2426 has undergone several changes in the past few years. Before 2014, K.S.A. 74-2426(c)(2) provided the Court of Appeals with jurisdiction over tax appeals. In 2014, the Legislature amended the statute to provide aggrieved persons with the option of appealing to the Court of Appeals or the district court. L. 2014, ch. 141, § 1; K.S.A. 2014 Supp. 74-2426(c)(4)(A). The statute specified that "[a]ny appeal to the district court shall

17

be a trial de novo." K.S.A. 2014 Supp. 74-2426(c)(4)(A). The 2016 amendment to the statute added the language: "Notwithstanding K.S.A. 77-619, and amendments thereto, the trial de novo shall include an evidentiary hearing at which issues of law and fact shall be determined anew." L. 2016, ch. 112, § 3; K.S.A. 2016 Supp. 74-2426(c)(4)(B). The district court interpreted the new language to require it to conduct the proceedings as an original action filed in the court, with all evidence presented at the trial.

The concept of a trial de novo in the district court as an avenue for review of an agency action was not a novel concept in Kansas law. Nevertheless, the nature and limits of a trial de novo have been subject to dispute in a multitude of agency action appeals. At one point, our Supreme Court held that constitutional separation of powers issues limited a district court's review of an administrative action, and that the Legislature could not "impose upon the judiciary the function of a trial de novo in the true legal sense in reviewing orders of an administrative agency." *Jenkins v. Newman Memorial County Hospital*, 212 Kan. 92, 99, 510 P.2d 132 (1973). The court has since disapproved of this statement in *Stephens v. Unified School District*, 218 Kan. 220, 236, 546 P.2d 197 (1975).

In *Stephens*, the court considered an appeal to the district court from a decision of the Kansas Commission on Civil Rights (KCCR). The district court declared that it would conduct a trial de novo, allowed the parties to engage in unlimited discovery, and directed the parties to exchange witness lists. Ultimately, neither party offered new evidence and they submitted the matter to the district court on the record of the KCCR. The appellant argued that the district court erred by "conduct[ing] a trial de novo, making its own findings of fact, drawing its own inferences from the record, and substituting its judgment for that of the administrative agency." 218 Kan. at 224. The district court did not "limit its review to determining whether the commission's findings were supported by

substantial evidence, but substituted its own judgment for that of the commission on what the evidence proved." 218 Kan. at 228.

K.S.A. 44-1011 at issue in *Stephens* provided that any person aggrieved by an order of the KCCR could obtain judicial review by filing a notice of appeal. 218 Kan. at 230. K.S.A. 44-1011 also stated that "'[t]he court shall hear the appeal by trial de novo with or without a jury in accordance with the provisions of K.S.A. 60-238, and the court may, in its discretion, permit any party or the commission to submit additional evidence on any issue.'" 218 Kan. at 230. The court noted that the de novo language was added to the statute in 1965, and that before the amendment K.S.A. 44-1011 read: "The court shall hear the appeal with or without a jury and the court may, in its discretion, permit any party or the commission to submit additional evidence on any issue." L. 1963, ch. 279, § 6. The court presumed, consistent with caselaw, that the Legislature intended to effect some change in the law through the revision. 218 Kan. at 231 (citing *Curless v. Board of County Commissioners*, 197 Kan. 580, 587, 419 P.2d 876 [1966]; *Horyna v. Board of County Commissioners*, 194 Kan. 445, 399 P.2d 844 [1965]). The court concluded that "when the legislature called for a trial de novo ('with or without a jury in accordance with the provisions of K.S.A. 60-238') it meant a trial where the issues of both fact and law would be determined anew." 218 Kan. at 232. The court approved of the way the district court conducted the trial de novo. 218 Kan. at 236.

Next, the court held that the constitutional separation of powers doctrine did not prevent district courts from conducting this type of de novo trial to review an agency action when the agency action was judicial in nature as opposed to administrative. 218 Kan. at 232-36. An agency action is judicial in nature when functions of the agency "could constitutionally have been entrusted to the courts in the first instance had the legislature so desired." 218 Kan. at 233. The KCCR's inquiry into a school district's alleged violation of the Kansas act against discrimination involved weighing evidence,

19

finding facts, and applying the law to the facts to determine whether the defendant's actions were unlawful. These are functions courts and juries typically perform, so the KCCR's action was judicial in nature and the district court's de novo review of that decision did not violate the separation of powers doctrine as the court had suggested in *Jenkins*. 218 Kan. at 236.

The *Stephens* court interpreted the language "trial de novo" in the context of an administrative appeal and defined it as "a trial where the issues of both fact and law would be determined anew." 218 Kan. at 232. This meant that the district court could assess witness credibility and reweigh the evidence without deference to the agency's findings. These phrases are used in K.S.A. 74-2426(c)(4)(B), which states that "the trial de novo shall include an evidentiary hearing at which issues of law and fact shall be determined anew." Nevertheless, the statute in *Stephens* did not require an evidentiary hearing. Rather, it gave the district court permission to allow evidence. Because the parties in *Stephens* did not seek to admit evidence beyond the agency record, *Stephens* does not help this court in interpreting that portion of K.S.A. 74-2426(c)(4)(B). *Stephens* is also notable for allowing the district court to reweigh the evidence based solely on an agency record. Typically, courts serving appellate functions do not resolve factual conflicts because they cannot assess witness demeanor and credibility in the same manner as the fact-finder. See *State v. Dwyer*, 28 Kan. App. 2d 238, 240, 14 P.3d 1186 (2000).

Another appeal from a KCCR decision, involving the same trial de novo language analyzed in *Stephens*, was decided in *Nurge v. University of Kansas Med. Center*, 234 Kan. 309, 674 P.2d 459 (1983). The parties presumed that the district court would examine the KCCR's record de novo and that no new or additional evidence would be presented. Nevertheless, rather than reviewing the agency record, the court "required the parties to present as many witnesses as possible to re-testify before the court." 234 Kan. at 311. If witnesses were unavailable, the court allowed the parties to introduce portions

20

of the KCCR record. On appeal to our Supreme Court, both parties asserted that the district court erred by requiring "witnesses who had already testified before the KCCR examiner testify again in person before the court." 234 Kan. at 310.

The court reviewed *Stephens* and noted that the case did not determine "whether the trial court may require live testimony and re-presentation of the evidence." 234 Kan. at 313-14. After reviewing the caselaw, the court concluded:

"[T]he essence of the action is a review of the KCCR proceedings, a review in which an independent but thorough examination of the KCCR record is of primary importance. . . . We have held that a court of error and review, with the power to affirm, reverse, or modify the judgment appealed from, must decide the questions presented *as they arise upon the record;* such being the general character of appellate procedure, a full trial de novo would be an anomaly, and can take place only by virtue of express authority. Statutes purporting to grant the authority to hold trials de novo on appeal are to be strictly construed. Based on the distinction between original and appellate jurisdiction, we have elsewhere held that where a statute authorizes persons aggrieved by an agency decision to commence an *independent action* to enjoin enforcement of that decision rather than appeal the order, the proceeding is not a review but is an original action calling for full trial de novo *without regard to the record* of the proceedings before the agency. [Citations omitted.]" 234 Kan. at 315-16.

The court also noted "that a de novo action under K.S.A. 44-1011 has elements of both an original action and a review," but "it appears clear that the appellate nature of the proceeding is predominant." 234 Kan. at 317. The statute made multiple references to "appeal" and "review." By making the review "de novo" the Legislature widened a district court's scope of review to allow "issues of both law and fact to be determined anew." 234 Kan. at 317.

21

The court held that the district court erred by compelling witnesses to retestify where the evidence was already in the agency record. "To disregard the record on review," the court warned, "[I]s to destroy the appellate nature of these actions and engage in an entirely original proceeding for which there is no statutory authorization." 234 Kan. at 317. Recognizing that the statute at issue allowed the parties to introduce "additional evidence," the court stated that "[a] repetition of evidence already presented to the KCCR is not additional evidence which under the statute must be something in addition to or more than what is contained in the record." 234 Kan. at 317. Further, "Any other construction of the statute would result in the probability that by requiring entirely new testimony the district courts will be unable to duplicate with precision the evidence upon which the KCCR relied in making its decision." 234 Kan. at 318. This would negate the proceeding's nature as an appeal and review of the KCCR's action. Because the issue was not before the court, it did not address the scope of permissible additional evidence. 234 Kan. at 318.

From the previous caselaw, some clear principles emerge. A trial de novo is a "trial where the issues of both fact and law would be determined anew." *Stephens*, 218 Kan. at 232; see *Frick v. City of Salina*, 289 Kan. 1, 15, 208 P.3d 739 (2009). Review is "limited to the issues raised before the administrative agency." 289 Kan. at 21 (citing *Bruch v. Kansas Dept. of Revenue*, 282 Kan. 764, 774, 148 P.3d 538 [2006]; *Angle v. Kansas Dept. of Revenue*, 12 Kan. App. 2d 756, 764-65, 758 P.2d 226 [1988]). "Statutes purporting to grant the authority to hold trials de novo on appeal are to be strictly construed." *Nurge*, 234 Kan. at 316.

The primary point of contention is deciding what evidence the district court should receive to decide the issues. *Nurge* and the present case are factually similar in how the district courts handled admission of evidence because both courts required the parties to present their witnesses anew. There are differences, however, between the *Nurge* statute

22

and the BOTA appeal statute. The *Nurge* statute stated that the court may allow additional evidence. *Nurge*, 234 Kan. at 311. Under the current statute, the district court shall hold an evidentiary hearing notwithstanding K.S.A. 77-619. K.S.A. 74-2426(c)(4)(B). Thus, we must consider if the new language in the BOTA appeal statute shows the kind of explicit legislative intent to deviate from the procedure set forth in *Nurge*. In *Frick*, our Supreme Court examined several statutes in which the Legislature explicitly authorized a new trial.

In *Frick*, the City of Salina acquired property owned by Ben and Lavelle Frick through eminent domain. The Fricks, dissatisfied with their relocation benefit award, appealed the decision. There were two administrative hearings, each on a different category of relocation expenses. Following each hearing, the administrative hearing examiner issued separate decisions that mostly upheld the City's awards.

The relocation assistance law provided for appeal to the district court and explained that "[a]ny such appeal to district court shall be a trial de novo only on the issue of relocation benefits." K.S.A. 58-3509(a). As in this case, the parties disagreed from the start about the standard of review to be applied by the district court. The Fricks argued that the plain language of the statute entitled them "to a trial anew on the merits of the issue." 289 Kan. at 5. The City argued that the KJRA controlled, and that the district court's review had to be limited to the administrative record.

The district court ruled that it was required to review the record before the hearing examiner to determine if the decision was lawful. Nevertheless, the court also ruled that the Fricks could present additional evidence on the fairness and reasonableness of the relocation payments. The district court also ruled that the KJRA did not apply to the case, but that it was still limited to reviewing the administrative record due to separation of powers concerns. After this ruling, the Fricks filed a witness and exhibit list identifying

23

24 witnesses and numerous exhibits. They also served 37 interrogatories and a request for production of 27 types of documents. The City asked the court to clarify its previous ruling. The court decided to modify its order allowing the Fricks to supplement the agency record with additional evidence. Later, the district court ruled that the hearing examiner's findings were lawful. The Fricks appealed, and their appeal was transferred to our Supreme Court.

The Fricks argued that the "trial de novo" language in the relocation payment statute entitled them "to receive a new trial on the merits, with the opportunity to conduct discovery, call new witnesses, and introduce evidence not included in the administrative record." 289 Kan. at 7.

Our Supreme Court began its analysis of the "trial de novo" language by noting that the procedures for appealing a relocation benefits decision to an independent hearing examiner "provide a displaced person the due process typically associated with a trial, including a record." 289 Kan. at 9. These procedures include attorney representation, examination of witnesses, introduction of documentary evidence, a requirement that the hearing examiner issue a written report containing findings of fact and conclusions of law, and the option to appeal to the district court. Without these procedures, the court opined that "the nature of appellate review would change or even be impossible." 289 Kan. at 9.

The court also approved of the district court's holding that the KJRA did not apply to the action. 289 Kan. at 11. Nevertheless, it disagreed with the district court's ruling that the separation of powers doctrine limited the district court's standard of review to determining whether the agency's order was supported by substantial evidence. While a limited standard of review applies to purely administrative decisions, the agency was performing a judicial function. 289 Kan. at 17. Under *Stephens*, this meant that the

24

district court should have conducted "'a trial where the issues of both fact and law would be determined anew.'" 289 Kan. at 15 (quoting *Stephens*, 218 Kan. at 232).

The Fricks' analysis did not end there. The court next elaborated on the nature of de novo review of agency actions where the agency is performing a judicial function. The court stated that even with de novo review, the Fricks could not necessarily present new evidence "because, even when an administrative agency has performed a judicial function, this court has held that statutes providing for de novo review on appeal from an administrative action must be construed strictly." 289 Kan. at 18. The court noted that it has never "'interpreted any statute to allow true de novo review in the sense of a new trial on facts and issues as though they had never been tried.'" 289 Kan. at 18 (quoting *Angle*, 12 Kan. App. 2d at 765). The court explained:

> "[W]hen a statute provides for trial de novo on appeal there is an ambiguity because, in natural and ordinary usage, an appeal does not signify a new, original action, it signifies a review of an existing decision. In light of this ambiguity and because de novo review statutes relating to administrative actions are construed strictly unless there is an explicit legislative direction otherwise, generally a provision for de novo review does not alter the appellate nature of the district court's authority on appeal, but rather it specifies the procedure to be employed." 289 Kan. at 18.

The court stated that after *Nurge*, a case in which the district court had the statutory power to hear "'additional evidence on any issue'" in a KCCR appeal, the district court was not allowed to disregard the agency record by requiring witnesses to retestify. 289 Kan. at 19. Instead, the district court had a duty "to conduct an independent and thorough examination of the record and make independent findings of fact and conclusions of law based on the record." 289 Kan. at 19. A de novo review of a KCCR order "'has elements of both an original action and an appeal' and . . . one of the elements of a valid de novo review, as previously identified in *Stephens*, is an independent

25

examination of the record." 289 Kan. at 19-20 (quoting *Flanigan v. City of Leavenworth*, 232 Kan. 522, 529, 657 P.2d 555 [1983]). The court has applied the *Nurge* holding to affirm "that the term 'de novo trial,'" when used in the context of an appeal from an administrative decision, does not mean new evidence can be introduced unless explicitly stated in the statute. 289 Kan. at 21.

A departure from the *Nurge* standard of review ("where a court makes independent findings of fact and conclusions of law based on the administrative record") is permissible "if a statute clearly expresses a legislative intent to allow new evidence." 289 Kan. at 21. The court gave the example of a driver's license suspension appeal under K.S.A. 2008 Supp. 8-259(a), which states that a driver's license suspension appeal "shall be by trial de novo to the court. The court shall take testimony and examine the facts." Nevertheless, even in those cases "review has been limited to the issues raised before the administrative agency." 289 Kan. at 21 (citing *Bruch*, 282 Kan. at 774; *Angle*, 12 Kan. App. 2d at 764-65).

As another example of "clear expression of a legislative intent to allow additional evidence on appeal" the court pointed to K.S.A. 2008 Supp. 26-508(a), which governs appeals of appraisers' awards under Kansas' Eminent Domain Procedure Act. 289 Kan. at 22. It provided that an appeal shall be a trial de novo in the district court and that "[t]he appeal shall be docketed as a new civil action, the docket fee of a new court action shall be collected and the appeal shall be tried as any other civil action." K.S.A. 2008 Supp. 26-508(a).

The Fricks argued that the court should construe the "trial de novo" language in the relocation assistance appeal statute the same as in the appraisers' award appeal statute. But the court distinguished the two statutes. The relocation assistance appeal statute had no additional language suggesting that the court could accept evidence or go beyond

reviewing the administrative record. 289 Kan. at 23. Additionally, no record is made of appraisers' hearings. Thus, it would be impossible to review the record in appraisers' award appeals. 289 Kan. at 22. The court concluded:

> "[W]hen the legislature chose to make repeated references to the terms 'appeal' and 'notice of appeal' and to use the phrase 'trial de novo' in the K.S.A. 58-3509, as it had in the statute construed in *Nurge* (K.S.A. 44-1011) and other similar statutes, we presume the legislature intended the scope of review to be as applied in *Nurge* and similar cases, as previously discussed." 289 Kan. at 23.

Thus, the district court in *Frick* "should have made independent findings of fact and conclusions of law regarding the question of relocation benefits based upon the record of proceedings before the administrative hearing examiner." 289 Kan. at 24.

Before the 2016 amendment, K.S.A. 74-2426(c)(4)(B) provided for only a trial de novo—there was no language calling for an evidentiary hearing at which issues of law and fact would be determined anew. At that time, the statute was like those at issue in *Nurge* and *Frick*. The district court was required "to conduct an independent and thorough examination of the record and make independent findings of fact and conclusions of law based on the record." *Frick*, 289 Kan. at 19. The court could not disregard the record, because doing so without statutory authorization would "destroy the appellate nature of these actions." *Nurge*, 234 Kan. at 317.

The language added to K.S.A. 74-2426 through the 2016 amendments seems to fall into the exception discussed in *Nurge* and *Frick*. When the Legislature revises an existing law, this court presumes that the Legislature intended to change the law as it existed before the amendment. *Stueckemann v. City of Basehor*, 301 Kan. 718, 745, 348 P.3d 526 (2015). The position advocated by KDOR here is inconsistent with the new statutory language. KDOR's assertion that the district court should have ruled upon the

administrative record would essentially limit the court to the *Nurge* standard of review and inject ambiguity into the language of K.S.A. 74-2426(c)(4)(B). Also, KDOR's supposed distinction would erase the plain meaning of K.S.A. 74-2426(c)(4)(B).

Thus, KDOR's interpretation would disregard the revised statutory language of K.S.A. 74-2426(c)(4)(B) and render it meaningless. This court generally presumes that the Legislature "does not intend to enact useless or meaningless legislation." *Milano's, Inc. v. Kansas Dept. of Labor*, 296 Kan. 497, 501, 293 P.3d 707 (2013). The revised language in K.S.A. 74-2426(c)(4)(B) does more than grant a trial de novo appeal. It requires the court to hold an evidentiary hearing, and in the same sentence states that the issues of law and fact shall be determined anew at that hearing. K.S.A. 74-2426(c)(4)(B) ("[T]he trial de novo shall include an evidentiary hearing at which issues of law and fact shall be determined anew."). This is very similar to the language in the driver's license suspension appeal statute, which states that "[t]he court shall take testimony" and "examine the facts of the case." K.S.A. 2020 Supp. 8-259(a).

In short, the Legislature clearly intended to give taxpayers a second bite at the apple with the enactment of K.S.A. 74-2426(c)(4)(B)—to offer taxpayers yet another opportunity to challenge a tax assessment. Indeed, when Governor Sam Brownback vetoed S.B. 280, he specifically mentioned this result in his veto message:

> "The bill that I am vetoing today renews the concerns I expressed two years ago, by adding a new provision that would for the first time allow tax cases that are on appeal and eventually remanded to the Board of Tax Appeals to then be the subject of a subsequent appeal to a district court, where the court would conduct an entirely new trial and decide all of the issues over again. Section 3(c)(4)(B). This new possibility of a district [court] 'trial de novo,' as defined in this provision, improperly gives parties in previously determined matters a second opportunity to litigate their cases, and essentially nullifies the prior proceedings—thereby wasting the time, effort, and expenses incurred by the parties and the courts in these matters. Significantly, the Kansas courts have

28

recognized that the Board of Tax Appeals already performs the necessary judicial function of an initial court of record for the matters at issue here—a function that would be upended by this legislation.

> "The new appeal right contained in this bill would be very beneficial to parties in cases positioned to take advantage of them, and as it turns out, to one case in particular. The State of Kansas is currently litigating an income tax matter in which the state has received a tax deposit of $48,467,227.00. The taxpayers in that case, Mr. and Mrs. O. Gene Bicknell, have been supporters of and financial donors to my campaigns for public office, as well as the campaigns of many others. Mr. Bicknell was a candidate for the Republican nomination for Governor of Kansas in 1994. His tax dispute with the State of Kansas far predates my election as Governor, but the litigation has continued throughout my administration and I have always taken the position that the matter should be left to the Department of Revenue and the court system. [Citations omitted.]" Sen. Journal, p. 3047 (June 1, 2016).

The governor vetoed the bill because he was concerned with the inefficiency of litigating two proceedings, the first of which would essentially be nullified. Nevertheless, the Legislature overrode the veto with only one person voting against the bill. The Legislature meant exactly what it said: a hearing anew. Thus, the legislative history shows the 2016 amendment to K.S.A. 74-2426 explicitly intended to allow taxpayers to initiate an entirely new action in the district.

KDOR, however, argues that the district court's interpretation of the statute is contrary to the concept of judicial review. While it is an "anomaly" for a reviewing court to conduct a full trial de novo, it can take place "by virtue of express authority." *Nurge*, 234 Kan. at 316. Other Kansas statutes allow for a full trial de novo for a court performing an appellate function. See *Manzano v. Kansas Dept. of Revenue*, 50 Kan. App. 2d 263, 268, 324 P.3d 321 (2014) (stating that where a person is unsuccessful at challenging a driver's license suspension at an administrative hearing, the person "may petition for review in the district court, in which case the matter is tried 'de novo' there,

which means that the district court decides the matter independently based solely on the evidence presented to it"); see also K.S.A. 26-508(a) ("An appeal by the plaintiff or any defendant shall bring the issue of damages to all interests in the tract before the court for trial de novo. The appeal shall be docketed as a new civil action, the docket fee of a new court action shall be collected and the appeal shall be tried as any other civil action."). Here, the fact that the district court did not perform a traditional KJRA judicial review was intended by the Legislature.

KDOR also argues that the district court's interpretation of the statute essentially repealed the KJRA by implication. While K.S.A. 74-2426(c)(4)(B) certainly exempts tax appeals from some of the appeal procedures in the KJRA, others remain unchanged. The petition for review still must meet the pleading requirements in K.S.A. 77-614. See *White v. Kansas Dept. of Revenue*, 38 Kan. App. 2d 11, 16, 163 P.3d 320 (2006) ("[T]he KJRA says that the petition for review 'shall' contain certain specific information. K.S.A. 77-614[b]. That provision makes no distinction based upon the applicable standard of review and does not exempt trials de novo from the specific pleading requirements."). The requirement that a party exhaust his or her administrative remedies per K.S.A. 77-612 is similarly unchanged. There also remains a limitation on raising new issues under K.S.A. 77-617. See *Angle*, 12 Kan. App. 2d at 764 (applying principles from *Nurge* and holding that a plaintiff appealing a driver's license suspension under a statute which allows the district court to conduct a true trial de novo is still limited to issues raised at the administrative hearing). Thus, the court's interpretation of the statute did not, as KDOR argues, silently repeal the KJRA.

KDOR next asserts that the district court erred in ignoring the agency record, noting that K.S.A. 77-620(a) requires the agency to transmit the record to the district court "for judicial review of the agency action." Nevertheless, this procedure is no different than in driver's license suspension appeals which are also conducted by trial de

novo to the district court and subject to the KJRA. See K.S.A. 2020 Supp. 8-259(a). There exists an understandable concern about the duplicative nature of the proceedings under K.S.A. 74-2426(c)(4)(B). The governor recognized this concern in his veto message, noting the extra time, effort, and expenses the statute created and how the procedure effectively nullified the agency proceedings. Nevertheless, "The plain language selected by the legislature, when it does not conflict with constitutional mandates, trumps both judicial decisions and the policies advocated by the parties." *State v. Spencer Gifts*, 304 Kan. 755, Syl. ¶ 2, 374 P.3d 680 (2016). "[T]he question of the wisdom, justice, or expediency of the legislation is for that body and not for the courts." 304 Kan. 755, Syl. ¶ 4.

Finally, KDOR argues that the district court's construction of the statute is unreasonable because it will allow taxpayers to "use BOTA proceedings as nothing more than discovery of the government's evidence and legal arguments without presenting their own." As stated earlier, this court does not address policy arguments. Also, there are structures in place to ensure that taxpayers do not treat the BOTA proceedings in this way. BOTA proceedings are conducted under the Kansas Administrative Procedure Act, which allows discovery consistent with the rules of civil procedure. K.S.A. 74-2426(a); K.S.A. 77-522(a). The rules of civil procedure contain processes for compelling discovery, and sanctions for failure to comply with the discovery process. K.S.A. 2020 Supp. 60-237. Taxpayers should also feel incentivized to present their evidence because even if they succeed before BOTA, KDOR can appeal to the Court of Appeals. See K.S.A. 74-2426(c)(4)(A).

*Was Venue Proper in Crawford County?*

KDOR argues that Crawford County is not a proper venue for this action. When the Bicknells filed their petition for judicial review in the district court of Crawford

31

County, KDOR responded with a motion to dismiss based, in part, on the argument that venue did not lie in Crawford County. KDOR asked the district court to dismiss or transfer the case to an appropriate venue. The district court held that venue was proper in Crawford County because BOTA's order was effective there and because it would be the most convenient forum for trial. Now, KDOR reasserts its argument and asks this court to reverse the district court's decision.

Determining whether venue exists under the KJRA is "a matter of statutory interpretation which is a question of law subject to unlimited review." *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 625, 372 P.3d 1252 (2016). Also, KDOR raised this issue in a motion to dismiss, and this court "review[s] the district court's decision on a motion to dismiss using a de novo standard of review." *Wachter Management Co. v. Dexter & Chaney, Inc.*, 282 Kan. 365, 368, 144 P.3d 747 (2006). In doing so, this court construes the facts in the light most favorable to the petitioners. See 282 Kan. at 368.

As a preliminary matter, the Bicknells argue that KDOR's claim should fail for failure to designate a record establishing prejudicial error, citing the rule that the appellant has the duty to provide the appellate court with a record showing the district court's error. *Akesogenx Corp. v. Zavala*, 55 Kan. App. 2d 22, 42, 407 P.3d 246 (2017) (holding that appellant failed to meet his burden of submitting a record establishing error by failing to include a transcript of a hearing on a motion to set aside a default judgment). The parties argued KDOR's motion to dismiss at a hearing on December 22, 2017. Nevertheless, KDOR did not provide a transcript of that hearing in the appellate record. KDOR does not respond to this argument in its reply brief.

The lack of a hearing transcript is not fatal to KDOR's claim. In the case cited by the Bicknells, appellant Robert Zavala failed to include a transcript of a hearing on his

32

motion to set aside a default judgment, and the district court's journal entry denying the motion merely stated that it was denied for the reasons stated on the record. On appeal, Zavala raised three arguments, which he also raised in his motion to set aside the default judgment, relating to service of process, to the timeliness of the entry of the default judgment, and to the excusable neglect. Nevertheless, this court held that the appellate record was inadequate to determine whether the court abused its discretion on the three issues raised because the record merely stated that the court denied the motion for the reasons stated at the hearing. 55 Kan. App. 2d at 42. Because Zavala failed to include a transcript of the hearing in the record, this court "simply ha[d] no idea why the district court denied Zavala's motion." 55 Kan. App. 2d at 42.

In *Akesogenx Corp.*, the district court's individual rulings on the appellant's arguments were not part of the record, but its ultimate decision was. This is not the case here. In the journal entry denying KDOR's motion to dismiss, the district court responded individually to KDOR's arguments. In holding that venue was proper, the district court reasoned that BOTA's order is effective in Crawford County under K.S.A. 77-609(b) and that Crawford County was the convenient forum for trial. Also, the district court's ruling was based on the facts alleged in the Bicknells' petition, and this court has access to the facts necessary to determine the issue. Thus, this court is in just as good of a position as the district court was to decide the issue on the merits.

The KJRA's venue provision, K.S.A. 77-609(b), provides that "venue is in the county in which the order or agency action is entered or is effective or the rule and regulation is promulgated." Nevertheless, "[V]enue may be proper in more than one county." *Rhodenbaugh*, 52 Kan. App. 2d at 626. And, "Where venue for a KJRA proceeding is proper in more than one county, the district court should give due consideration to the plaintiff's right to choose the place of the action." 52 Kan. App. 2d at 628. A district court may look to the Code of Civil Procedure, K.S.A. 2020 Supp. 60-101

33

et seq., "[T]o supplement the KJRA if the provision is a logical necessity that is not addressed within the KJRA." *Pieren-Abbott v. Kansas Dept. of Revenue*, 279 Kan. 83, 97, 106 P.3d 492 (2005) (looking at the Code of Civil Procedure to give effect to the service of summons direction of K.S.A. 8-1020[o]). The Code of Civil Procedure has more detailed guidelines on how to determine venue. See K.S.A. 2020 Supp. 60-601 et seq.

Venue exists where BOTA's order was entered or where it is effective. K.S.A. 77-609(b). The order was entered in Shawnee County, so venue is proper in Crawford County only if BOTA's order is effective there. The parties dispute whether the order is "effective" in Crawford County. KDOR argues that the Bicknells lived in Florida when BOTA's summary decision was entered, and thus the effects of the order are felt in Florida. The Bicknells contend that the order did impose "continuing burdens and risks on the Bicknells' remaining interests in Crawford County."

This court has been asked to interpret the term "effective" as the term has been used in the KJRA on two occasions. In *Karns v. Kansas State Bd. of Agriculture*, 22 Kan. App. 2d 739, 923 P.2d 78 (1996), the Kansas State Board of Agriculture (KSBA) filed a complaint against Kermit Karns, a crop duster, alleging violations of the Kansas Pesticide Law (KPL). The KSBA determined that Karns violated the KPL as alleged in the complaint, assessed fines against Karns, and ordered that Karns' business license be denied and his certification be revoked. Karns petitioned for judicial review in the Pottawatomie County District Court. The KSBA requested a change of venue, arguing that venue should be transferred to Shawnee County because "all of the relevant contacts by Karns with KSBA had occurred there and all of KSBA's orders had been issued by the agency in Topeka." 22 Kan. App. 2d at 741. Karns responded that venue was proper in Pottawatomie County because that was where he conducted a bulk of his business activity. The district court denied the KSBA's motion for change of venue. When Karns

partially succeeded in his case before the district court, the KSBA appealed the adverse rulings to this court.

On appeal, the KSBA contended that the district court erred in denying its motion for change of venue. Karns argued that "because KSBA's order prevents him from crop dusting in all 105 counties in Kansas, venue lies in any of those 105 counties, including Pottawatomie." 22 Kan. App. 2d at 742. While this court declined to rule on whether venue would lie in all 105 counties, it did "agree that venue would lie in those counties in which Karns had been operating." 22 Kan. App. 2d at 742. This court stated that it was "uncontroverted that Karns was doing business in Pottawatomie County and that the KSBA's order was intended to apply to his operations in that county." 22 Kan. App. 2d at 743.

Later, in *Rhodenbaugh*, 52 Kan. App. 2d 621, this court faced another venue issue in the context of an unemployment appeal. There, Debra Rhodenbaugh filed for unemployment benefits after her employer, McPherson Hospital, terminated her for failing to get a flu vaccination. Initially, the Kansas Department of Labor awarded Rhodenbaugh unemployment benefits, but the hospital successfully appealed to the Kansas Employment Security Board of Review. Rhodenbaugh filed a petition for review of agency action in the McPherson County District Court. The hospital moved to dismiss the petition, arguing that McPherson County was an improper venue. The hospital contended that Shawnee County was the proper venue because the Board was located there and had entered its order there. The district court agreed and transferred the case to Shawnee County District Court where Rhodenbaugh was ultimately unsuccessful in her claim for unemployment benefits. Rhodenbaugh appealed to this court.

Rhodenbaugh argued on appeal that the district court improperly transferred her case to Shawnee County. This court acknowledged that Shawnee County was a proper

35

venue because the order was entered there, but this court also ruled that venue was proper in McPherson County. This court noted that "the Board's decision, if favorable to the plaintiff, would be effective in McPherson County only because Rhodenbaugh lived there and would receive her unemployment benefits there." 52 Kan. App. 2d at 628. This court acknowledged that these were "scant facts" and characterized them as "minimally" sufficient "to show that the Board's order or action was effective in McPherson County." 52 Kan. App. 2d at 628. Nevertheless, this court ruled that the error was harmless and that remanding the case would be futile. 52 Kan. App. 2d at 629. This court affirmed the denial of unemployment benefits. 52 Kan. App. 2d at 633-34.

KDOR's position is simple:  the order was not effective on the Bicknells in Crawford County because they lived in Florida when the decision was issued. The Bicknells admit that they do not still live in Crawford County, but they contend that the order "imposed continuing burdens and risks on [their] remaining interests" there. Nevertheless, the facts the Bicknells rely on are far removed from those in the cases discussed previously, including *Rhodenbaugh* where this court ruled the facts only minimally sufficient. And the Bicknells' facts show that the order has, at most, only an indirect effect on them in Crawford County. These facts will be considered.

Some of the Bicknells' arguments, however, do not have any bearing on why the venue should be in Crawford County. For example, the Bicknells argue that BOTA's order denied Gene the benefits of Florida residency for 2005 and 2006. This effect of the order has no relationship to Crawford County—its effect is mainly on Gene himself and not on a certain location. It would be effective whether Gene was in Florida, Kansas, Missouri, or elsewhere. Assuming without deciding that an order to pay taxes is considered "effective" in any particular county, it would have the most effect in the location where the taxpayer resided. Here, that was Florida. Similarly, the Bicknells argue that the order is effective in Crawford County because it created a rebuttable

36

presumption that Gene was a resident of Crawford County for 2007 and 2008, years for which a separate tax assessment is pending. Again, any influence of BOTA's order on future tax assessments will affect Gene regardless of what county he is in.

In support of venue in their petition for judicial review, the Bicknells alleged actions in Crawford County which they believed were affected by BOTA's order. For example, they listed several of Gene's actions in Crawford County that KDOR relied on in support of its domicile determination, including visiting friends and family, owning property, employing people, utilizing doctors and other professionals, serving with organizations, installing a new swing set at his house for his grandchildren and allowing them to use the pool there, allowing a cat named Checkers to remain at his house, attending business meetings, and attending church. They then contended that, because BOTA affirmed KDOR's assessment, it must have agreed that the activities listed amounted to domicile in Crawford County. The Bicknells concluded that the only way they could "rid themselves of the risk of additional assessments is to cut off all ties with Crawford County." Because of BOTA's order, the Bicknells asserted that they had to sever all ties to Crawford County and never return. They raise the same points on appeal, arguing that the order is effective in Crawford County because "Gene is no longer allowed to interact with friends and family in Crawford County, without tax-consequence risk" and Gene has to "choose between potential tax liability and time with grandchildren in Crawford County."

The Bicknells' argument is unpersuasive on this issue. Gene's ability to visit and operate in Crawford County is unchanged by BOTA's order. BOTA's order did not change the regulations which govern the domicile analysis. See K.A.R. 92-12-4a. Because BOTA issued a summary decision under K.S.A. 74-2426, the weight it assigned to various factors is unknown. It is also unknown whether BOTA accepted all of KDOR's arguments regarding which of Gene's actions supported domicile in Crawford County.

BOTA's order does state that it applied "the applicable KDOR regulations, statutes and caselaw" to the evidence, and that would include the provision that no single factor "shall, by itself, be a determinant of a person's domicile." K.A.R. 92-12-4a(b)(7). Also, the location of Gene's domicile arises from the law, not BOTA's order. While Gene argues that the order affects his activity in Crawford County, the true influence is from the laws and regulations governing the domicile regulations. Under current law, a taxpayer's actions are determinative of his or her domicile, and BOTA's order must apply this law.

The Bicknells isolate certain factors, such as visiting grandchildren, and assign them singular importance so they can claim an effect in Crawford County. While BOTA can consider any fact relevant in the determination of a person's domicile, the sole fact that a person visits his grandchildren occasionally in Crawford County while maintaining a residence in Florida does not constitute substantial evidence that the person was domiciled in Crawford County. The conclusion that Gene cannot visit his grandchildren is overbroad; it claims too much.

KDOR also characterizes the district court's decision as providing that an agency order is "'effective' everywhere in the state—plaintiff's choice." KDOR points out that allowing an order to be considered "effective" statewide defeats the purpose of the statutory language placing venue in the county where an order is entered.

The Bicknells take the opposite position: unless this court finds that venue does not exist unless a petitioner resides in that venue, then all income tax residency disputes will take place in Shawnee County "because the very nature of residency dispute is that the taxpayer contends not to live in Kansas."

This court need not decide if Shawnee County is the only Kansas county in which venue is appropriate for tax appeals. We must decide only if venue was appropriate in this case, and our court's ruling should be limited to the facts of the case. We conclude that the Bicknells have failed to show that BOTA's order was effective in Crawford County. The order affects the Bicknells equally in each Kansas county. This case is distinguishable from *Karns*, where the court held that venue was only appropriate in the counties in which Karns was doing business because he was no longer able to do business there. See 22 Kan. App. 2d at 743. This case is also distinguishable from *Rhodenbaugh*, where the facts were minimally sufficient to allow venue in McPherson County because Rhodenbaugh lived there, and she would have received her unemployment benefits there. 52 Kan. App. 2d at 628. Here, Gene does not live in Crawford County nor has he shown that the order will have any particular effect on him there. For these reasons, we conclude that the district court erred in finding that venue was appropriate in Crawford County.

Affirmed in part, reversed in part, and remanded with directions.

\* \* \*

ARNOLD-BURGER, C.J., concurring in part and dissenting in part: I respectfully dissent from the majority's holding that the district court improperly shifted the burden of proof of Gene Bicknell's residency for tax purposes to the Kansas Department of Revenue (KDOR). As a result, it finds that reversal of the district court's ruling is necessary and yet again remands the case to the district court. Instead, I would affirm the well-reasoned district court decision in all respects.

I will not repeat the statement of facts, as the majority does so accurately, but I will add some supplementary facts necessary to decide the issues that the majority did not reach. I begin with the erroneous conclusion central to the majority's reversal—the shifting of the burden of proof.

I.    THE DISTRICT COURT DID NOT SHIFT THE BURDEN OF PROOF TO THE KDOR

The primary issue is whether Gene Bicknell (Gene) was domiciled in Kansas for the tax years of 2005 and 2006. The two key elements to establish residence are bodily presence and an intent to remain there permanently or indefinitely. Once established, a residence "is presumed to continue until the same has been abandoned." *Estate of Schoof v. Schoof*, 193 Kan. 611, 614, 396 P.2d 329 (1964). "The length of the stay in the new abode is not of controlling importance, for no stated period of time is required to complete a change of residence; the change may be effectuated on the first day of arrival in the new location provided the requisite intent to establish residence therein be present." 193 Kan. at 614. "Residence is largely but not solely a matter of intent. A person's actual place of dwelling and his intention with respect to it as declared by his whole course of conduct are the controlling factors in ascertaining his residence." *In re Estate of Phillips*, 4 Kan. App. 2d 256, Syl. ¶ 6, 604 P.2d 747 (1980).

To sustain his burden here, Gene had to prove that he was domiciled in Florida during the assessment period. The district court recognized this, saying it was "incumbent upon Gene to demonstrate that he had met the necessary criteria as established by his actions and statements to establish a domicile of his choosing." Again, domicile has two elements—physical presence and intent to remain permanently or indefinitely. The district court found that Gene met his burden on both elements:  "The overwhelming evidence is that Gene through his actions established Florida as his domicile well before the tax years in question."

Besides discussing the evidence supporting Gene's claim, the court also discussed the lack of evidence contradicting Gene's claim. The KDOR has identified several purportedly erroneous comments from these discussions. In essence, the KDOR argues that by noting that the KDOR failed to present evidence to contradict Gene's evidence on

certain issues, the district court improperly shifted the burden of proof from Gene to the KDOR. The majority agrees. I disagree and will address each of these objectionable comments below.

A. *It was not improper burden shifting for the district court to note that the KDOR had produced no witnesses contradicting Gene's claim of Florida residency.*

The majority first holds that the district court shifted the burden of proof onto the KDOR by stating that the KDOR had produced no witnesses to contradict Gene's evidence that he lived in Florida during the assessment period. I believe the district court was merely weighing the evidence on Gene's physical presence in Kansas and Florida. It was reasonable for the court to note that there were many witnesses who testified that Gene lived in Florida during the assessment period, and no witnesses who testified that he lived in Kansas at that time.

The majority compares this case to *Peck v. University Residence Committee of Kansas State University*, 248 Kan. 450, 807 P.2d 652 (1991). But *Peck* is distinguishable.

*Peck* involved a student's application for resident status for fee purposes at Kansas State University (K-State). His application was denied, and he appealed to the Residence Committee. The Residence Committee determined that Peck failed to demonstrate entitlement to resident classification. The district court reversed, reasoning that the Residence Committee could not draw a negative inference from Peck's failure to present evidence on a factor. On appeal, K-State argued that this showed that the district court erroneously shifted Peck's burden of proof onto the Residence Committee to establish nonresidency. The Kansas Supreme Court agreed. The Supreme Court noted that Peck had the burden of proof and held that the district court's "reasoning impermissibly

41

shift[ed] the burden to the Residence Committee to prove nonresident status." 248 Kan. at 461.

In *Peck*, the applicant did not present sufficient evidence of residency and the district court erred by barring negative inferences from this failure. In this case, however, Gene did present sufficient evidence of Florida residency. This is not a case when the party with the burden of proof failed to present sufficient evidence, but the district court ruled in their favor regardless because the opposing party also failed to present evidence. This is a case when the party with the burden of proof presented sufficient evidence and the opposing party presented no compelling evidence to contradict it. For that reason, *Peck* is distinguishable.

Instead, I believe, the district court's statements here are more analogous to those examined in *Blue Cross & Blue Shield of Kansas, Inc. v. Praeger*, 276 Kan. 232, 75 P.3d 226 (2003) (*BCBS*). There, Anthem Insurance Companies and Blue Cross and Blue Shield of Kansas sought approval of a merger from the Commissioner of Insurance. The Commissioner must approve a merger unless, after a hearing, the Commissioner finds evidence supporting one of five factors. See K.S.A. 40-3304. To assist her review, the Commissioner formed a Kansas Insurance Department (KID) Testimonial Team to examine the request. The KID team had the burden of providing evidence on the factors that could defeat the merger. The Commissioner ultimately denied the requests from Anthem and BCBS, issuing an order with many factual findings. They appealed.

One of the arguments Anthem and BCBS made on appeal was that "the Commissioner improperly shifted the burden of proof from the testimonial team to them." 276 Kan. at 274. In support, they cited language from several of the Commissioner's findings. For example, that "Anthem and BCBSKS provided 'no substantial evidence.'" 276 Kan. at 274. In fact, the Commissioner found that "[Anthem and BCBSKS]

42

presented 'no evidence' or 'little evidence.'" 276 Kan. at 274. Most importantly, the Commissioner concluded that "'[t]he lack of evidence supporting a conclusion that Anthem will reduce medical expenses, change benefit design, increase membership or lower administrative expenses, necessarily points the analysis toward premium rate increase.'" 276 Kan. at 274. This language is nearly identical to the district court's statement here.

Our Supreme Court rejected the argument that the Commissioner's statements improperly shifted the burden of proof. It held that "the Commissioner simply weighed the evidence and found that the evidence was more weighty and persuasive that the premium rates would be increased faster with the acquisition than without." 276 Kan. at 274. The same conclusion is warranted here. The district court did not shift the burden of proof to the KDOR by merely noting the fact that the KDOR had produced no witnesses to testify that Gene lived in Kansas during the assessment period. The district court was properly weighing the evidence that the parties presented on Gene's presence in Florida and found Gene's evidence to be weightier.

Arguments much like the KDOR's have been made and rejected in criminal cases in which a defendant argues that the prosecutor shifted the burden of proof by mentioning that the defendant failed to present certain evidence. For example, in *State v. Wilson*, 295 Kan. 605, 289 P.3d 1082 (2012), the State presented evidence that Kenneth Wilson's DNA was found on a cigarette butt at the scene of a crime. During closing arguments, the prosecutor noted that Wilson had no explanation for why his DNA was at the crime scene. Wilson argued on appeal that this improperly shifted the burden of proof onto him by implying that he had to provide an innocent reason for the presence of his DNA at the crime scene. The Kansas Supreme Court disagreed, noting that the prosecutor could comment "on the efficacy of Wilson's defense by pointing out to the jury where Wilson's version of events logically broke down." 295 Kan. at 624; see, e.g., *State v. Williams*, 299

43

Kan. 911, 937, 329 P.3d 400 (2014) (prosecutor's statement to the jury that "'[t]he defense has subpoena power identical to the State,'" suggesting that the defense could have called witnesses to contradict the victim's story, did not shift burden of proof); *State v. Stone*, 291 Kan. 13, 18-19, 237 P.3d 1229 (2010) (prosecutor's statement that the defendant had "'obstacles to overcome'" to present a credible defense did not shift burden of proof); *State v. Watson*, No. 118,710, 2019 WL 3511827, at *3-4 (Kan. App. 2019) (unpublished opinion) (prosecutor's statement that defendant provided "'no information, no proof, no evidence'" in support of his defense did not shift burden of proof), *rev. granted* 312 Kan. ___ (August 27, 2020).

This line of caselaw shows that, in criminal cases, a prosecutor does not shift the burden of proof by commenting on the lack of evidence rebutting the State's case. This is also true in civil cases when an arbiter makes a similar statement about the lack of evidence to rebut the plaintiff's case, as shown by *BCBS*, 276 Kan. 232. This rule makes sense. If there is uncontroverted evidence on the record supporting the plaintiff in a case, then the district court would commit error if it ignored that evidence and ruled in favor of the defense. *Casco v. Armour Swift-Eckrich*, 283 Kan. 508, 515, 154 P.3d 494 (2007) ("[A] factfinder cannot disregard undisputed evidence that is not improbable, unreasonable, or untrustworthy. Such evidence must be regarded as conclusive."). In these situations, the defense must do something to contradict or challenge the credibility of the evidence presented by the plaintiff.

Gene had the burden of proving two elements of domicile—physical presence and intent. The testimony, including testimony from Gene, his wife Rita, his son Marty, his assistant Karen Badart, Badart's assistant Cindy Morris, and Gene's friends and associates, was consistent that Gene's physical presence in Kansas began to diminish in early 2000, and by 2003 he was living in Florida. While Gene may have visited Pittsburg, he would only do so if there were a reason to be there such as a meeting or family event.

44

Otherwise, he would be in Branson, Missouri, or Florida. The district court found that this testimony was credible and corroborated by external evidence. It was only then that the court made the statement at issue—that in 10 years a single witness had not been found to testify in support of the KDOR's position that Gene was living in Kansas. The district court's comment was a permissible comment on the weight of the evidence, not a shifting of the burden of proof.

      *B. The district court's holding was not a negative finding that shifted the burden of proof.*

      The majority also accepts the KDOR's argument that the district court's statement about the KDOR's failure to produce any witnesses to contradict Gene's evidence that he lived in Florida during the assessment period constituted a negative finding that shifted the burden of proof. A negative finding "indicates that the party upon whom the burden of proof is cast did not sustain the requisite burden." *EF Hutton & Co. v. Heim*, 236 Kan. 603, 610, 694 P.2d 445 (1985). I do not believe the district court made a negative finding because the burden of proof was not on the KDOR. If the court had found that Gene failed to present sufficient evidence of Florida domicile, then it would have made a negative finding which this court could not have "disturbed absent proof of an arbitrary disregard of undisputed evidence or some extrinsic consideration such as bias, passion or prejudice." 236 Kan. at 610. But the district court held that Gene did sustain his burden of proof. The court's comment that the KDOR failed to produce witnesses to contradict Gene's evidence did not shift the burden of proof to the KDOR.

      Just because a district court finds that a party failed to present evidence on an issue does not mean that the party had the burden of proof. There are situations, as here and in *BCBS*, when the court may weigh evidence on both sides of an issue and find the evidence lacking on one side. The KDOR cites no persuasive authority for the

45

proposition that a district court's comment on the lack of evidence supporting a defense theory shifts the burden of proof to the defendant. Accepting the KDOR's position will bar district courts from properly weighing the evidence when making factual determinations. District courts will no longer be able to point out the lack of evidence supporting a defense theory because they will risk being reversed on appeal for shifting the burden of proof.

C. *The district court did not require the KDOR to prove that Gene committed tax fraud.*

The majority also concludes that the district court improperly imposed a burden on the KDOR to prove that Gene committed tax fraud. The majority cites the district court's finding that Gene did not commit tax fraud as evidence that the court required the KDOR to prove that the motivation for Gene to change his domicile to Florida was to avoid or reduce his Kansas income tax liability during the assessment period. For reasons related to those I have outlined above, I disagree.

The district court held that it was making the statement at issue "to acknowledge for the record the court's consideration of KDOR's suggestions of improper intent." It is true that the KDOR made these suggestions. For example, in its response to the Bicknells' proposed findings, the KDOR argued:

"Gene's claimed intent to be a Florida resident is not corroborated by any evidence, and the lack of evidence—and credibility—certainly fails to overcome his burden of proof. This evidence shows Gene is willing to take any act and make any statement, including under oath, to further his own cause, whether it is to vote in a swing state during a hotly contested presidential election, obtain a homestead tax credit in Florida, obtain angel tax credits in Kansas, save on auto

46

insurance, serve on the board of a Kansas bank, or dodge paying his lawful share of Kansas income tax."

Later, the KDOR raised tax fraud again: "The elephant in the room whenever the motive for establishing Florida residence is concerned is the fact Florida has no income tax. That is **the** reason to try to claim Florida residence or domicile, while still working and living elsewhere." Raising the argument yet again, the KDOR stated:

"Gene cannot credibly contend that selling NPC before he retired never occurred to him and that first changing his residence to avoid Kansas income tax also never occurred to him. Why else ask the Company's CFO, who later was deeply involved in the NPC sale negotiations, what it took to establish a residency? Why not simply 'move' if that was the intent? Establishing a Florida residence to avoid Kansas income tax is not inherently improper, but it requires an actual *move* to Florida, which Gene did not do, rather than merely claiming Florida's tax benefits as Gene did. Of course, this motive is relevant to determining his domiciliary intent."

It was not improper for the district court to address the arguments raised by the KDOR. Nor was it improper for the district court to find that there was "no evidence Kansas income tax avoidance was a motivating factor" in Gene's decision to move to Florida. This is not a case in which the district court, sua sponte, injected the issue of tax fraud into the proceedings. The KDOR raised this argument to cast doubt on Gene's credibility, and the district court's comment was a reasonable response on the lack of evidence supporting the KDOR's position. As explained above, noting that evidence does not support a defense theory does not shift the burden of proof onto the defendant. See *BCBS*, 276 Kan. 232.

47

The majority also challenges the district court's statement that "the court would have been much more likely to construe evidence in favor of KDOR and against Gene when appropriate" if the evidence had "support[ed] a design or plan on the part of Gene to purposefully deprive the State of Kansas of revenue to which they were rightfully entitled." The majority finds that this establishes another improper burden shift onto the KDOR. But I find this to be a proper statement of the law.

While motive does not control the domicile analysis, it is relevant to domiciliary intent. "Acquisition of a domicil of choice in a given place requires legal capacity, physical presence within its confines and an intention to make that place one's home (see [Restatement (Second) of Conflict of Laws § 15 (1971]). Provided that these requirements are met, it is immaterial what motives led the person to go there." Restatement (Second) of Conflict of Laws § 18, comment f (1971). Even so, motive does have bearing on a person's intent. The Restatement (Second) of Conflict of Laws § 18, comment f (1971), explains:

> "[A] person's motives in going to a place do have an intimate bearing on his attitude of mind toward it. If he goes there to accept a lifetime employment, he almost certainly intends to make his home there. A contrary inference, however, might well be drawn if the change of abode was for purposes of health, to accept public office or a temporary job or to escape from creditors. The fact that the move was dictated by a desire to obtain some special advantage, as a divorce or the avoidance of taxes, may give rise to the inference that the person had no bona fide intention to change his home and that therefore no new domicil was acquired."

Thus, evidence of motive can impact a court's analysis of domicile. The district court was merely recognizing as much when it stated that evidence of tax fraud would have impacted the weight and credibility it assigned to the evidence. As the Bicknells noted in

48

their brief, Gene took several actions that supported Florida domicile during the assessment period: "The question, then, was *why* Gene took these actions. Gene said it was because he wanted to be a Florida resident. The [KDOR] argued he did so to avoid Kansas taxes. The district court simply rejected the [KDOR's] defense theory on the basis of a global lack of evidence, and the court's indication that it would have weighed the evidence differently if some evidence *had* indicated a motive by Gene to avoid taxes . . . did not impose any burden on the [KDOR]."

I would also note that the district court made clear that motive was a secondary consideration to whether Gene met his burden of proof. Motive was a component of the credibility that the court assigned to Gene's evidence. The court demonstrates this in the language it uses. It begins this section of its opinion by saying it would discuss how motive impacts "construing evidence in a light more favorable to either party." The court also planned to discuss "whether motive was relevant, particularly where the necessary proof of change of domicile exists." These statements show that the court was addressing how motive impacted the case *after* Gene had already provided the evidence necessary to make his prima facie case.

The court also stated that it considered motive "together with Gene's contemporaneous actions and statements, the facts and circumstances then in existence, and Gene's testimony regarding his intent" in coming to the conclusion that Gene intended to establish Florida as his domicile. The court also stated that "as important as sincere intent might be it alone is not enough." These statements provide more support that the district court considered other evidence, evidence that Gene had to present to meet his burden of proof.

Gene needed to provide evidence, including evidence of both intent and physical presence, that he maintained a Florida domicile during the assessment period. The KDOR

49

challenged Gene's evidence and presents its own evidence and theory of the case. One of the ways the KDOR challenged Gene's evidence was by arguing that his intent to remain in Florida after allegedly moving there in 2003 was insincere. Gene argued that he moved to Florida and intended to remain there; the KDOR argued that Gene did not move to Florida and could not meet the requisite intent element. The district court's rejection of the KDOR's argument did not shift the burden of proof.

Finally, the court presented its findings on motive first in the court's findings section. If the district court had shifted the burden of proof to the KDOR on this issue and found the KDOR failed to sustain the burden, the court's analysis should have ended there. The court's opinion, however, analyzed the evidence and found that Gene met his burden of proving Florida domicile. This is inconsistent with the conclusion that the district court ruled against the KDOR because it failed to prove fraud.

The district court did not require the KDOR to prove intentional fraud, but it did consider the lack of evidence of intentional fraud in assessing weight and credibility to the other evidence. This is within the purview of the district court's authority. The court's opinion establishes that it held Gene to his burden of proof and did not improperly shift this burden on to the KDOR. A finding that the KDOR failed to contradict Gene's evidence of motive is not tantamount to a finding that the district court shifted the burden of proof onto the KDOR to prove tax fraud.

D. *The district court's findings that Rita was living in Florida instead of Kansas as stipulated did not shift the burden of proof to the KDOR.*

The majority's final example of burden shifting relates to the district court's comments on Rita's domicile. I would find that the court's comments on this issue were proper and consistent with the evidence.

50

The statement at issue appears during the court's application of the spousal presumption found in K.A.R. 92-12-4a(b)(5). This regulation provides that a person's domicile is assumed to be the same as his or her spouse's unless there is affirmative evidence to the contrary. Here, that means that the court should assume Gene's domicile to be the same as Rita's unless there is affirmative evidence to the contrary. This first requires the district court to determine what Rita's domicile was during the relevant time frame. The confusion on this issue arises because Rita began living in Florida in 2003 but claimed Kansas as her legal domicile until 2008.

The district court first found that, based on the evidence before it, Rita was domiciled in Florida during the assessment period despite her claim of Kansas domicile. This is a legal conclusion, drawn from the court's factual findings. The KDOR argues the district court was bound by Rita's stipulation that she was domiciled in Kansas until 2008, and thus the court had to presume that Gene was also domiciled in Kansas under K.A.R. 92-12-4a(b)(5). The problem with this argument is that "[a] court is not bound by erroneous stipulations or admissions regarding questions of law." *In re Adoption of A.A.T.*, 42 Kan. App. 2d 1, 7, 210 P.3d 640 (2006) (citing *Bright v. LSI Corp.*, 254 Kan. 853, 859, 869 P.2d 686 [1994]). The court may have been required to accept that Rita claimed Kansas as her domicile until 2008, but it did not have to conclude that her legal domicile actually was Kansas.

There were ample facts here to support the district court's conclusion that Rita's domicile was Florida during the assessment period. The testimony on where Rita lived from 2003 onward was consistent and uncontroverted. Her doctors diagnosed Rita with breast cancer in December 2002. Gene testified that he and Rita moved to Florida after the diagnosis, and that he became a permanent Florida resident in January 2003. Rita testified: "Since January of 2003, I have lived in Florida. . . . At our address on North

51

Manasota Key." Rita's treatment and convalescence both took place in Florida and Gene stayed with her during this time.

In August or September 2002, even before Rita's diagnosis, the Bicknells hired Joan Waters to look after the Pittsburg home. Rita explained that they did this because they were gone from Pittsburg and not spending much time in their home there. Waters concurred that the Bicknells were absent from Pittsburg for long periods of time beginning in 2002. They would visit Pittsburg occasionally for family events, and Gene would occasionally visit alone for business. She testified that between 2003 and 2006 Gene and Rita would usually be in Florida unless they had a reason to be somewhere else. Ronald Hobbs, the groundskeeper, similarly testified that the Bicknells were gone for months at a time after 2002, necessitating a housekeeper for the Pittsburg home. If the Bicknells returned to Kansas it was "usually for business or a family function" according to Hobbs. That the people most often present at the Bicknells' Pittsburg home testified that the Bicknells were not living there goes against the KDOR's position that Rita was living in Kansas during the assessment period.

The evidence shows that Rita remained in Florida after Gene left for Branson in April 2004 to perform Celebrate America. Celebrate America ran until December 2006, the end of the assessment period. Gene said that during this time he returned to Florida "[e]very chance [he] could get," even if his "understudy would have to work two days instead of one." This is because when he "was performing in Branson, [Rita] would be in Florida." Rita also testified that between 2004 and 2006, if Gene was not involved with Celebrate America in Branson "[h]e was with [her] in Florida."

Of course, the Bicknells were not wholly absent from Pittsburg during this period. Gene testified that he would occasionally go to board meetings for a bank in Pittsburg on Mondays, which were his off-day in Branson. He would drive to Pittsburg in the morning

52

and return to Branson after the meeting. The Bicknells also spent about a week in Kansas around Christmas to celebrate the holiday with their families before returning to Florida. Between Christmas and Gene's return to Branson in April, Gene testified that he and Rita would be in Florida as much as possible. Rita said she visited Kansas in late summer or early fall of 2004 to help a friend's political campaign. In 2005, she thought she visited family in Kansas over the summer. Sometimes, although she did not specify how often, she would visit Pittsburg, take a car, and drive to Branson to be with Gene.

The evidence was also clear that Rita claimed Kansas as her legal domicile until 2008. The parties explored Rita's claimed Kansas domicile and apparent Florida residence at trial. The KDOR asked Rita directly:

"Q.  During 2003 to 2006 you were still a resident of the State of Kansas; correct?
"A.  2003 to 2006 I was a legal resident of Kansas; correct[.]
"Q.  And you never moved to Florida until 2008; correct?
"A.  No, that's not correct. I moved to Florida. I've been living in Florida since 2003."

Rita testified that she did not claim Florida as a legal residence because "in order to vote in a certain area of that state you have to be—you know, you have to have a legal residence there and I wasn't ready to say no." She also explained:  "I wasn't ready not [to] be affiliated with Kansas in regard to political, some personal charitable things involved with, some long-time ties that would mean changing everything, but I was living in Florida."

Gene also testified that Rita "did not become a Florida resident until 2008," but he assured the court that "she spent a lot of time in Florida, more time than she did in Kansas. . . . [Rita] may have still maintained a Kansas residency, but her heart and her physical presence was in Florida most of the time." Gene said Rita did not want to change

53

Kansas residency and lose her law license, but that did not mean she was spending time in Kansas. From 2003 onward Rita "may have been a resident in Kansas but she was spending most of her time in Florida." And Rita's workload "wasn't heavy enough to keep her out of Florida."

Based on the above evidence, the district court's conclusion that Rita was domiciled in Florida was fully supported. As the court noted in the comment at issue, "Only Rita's desire would weigh in favor of Kansas. No other element of domicile has been sufficiently demonstrated by the evidence." "'A desire to retain an old domicil does not, of itself, prevent the acquisition of a new one.'" *In re Estate of Phillips*, 4 Kan. App. 2d at 262. It is apparent that the Bicknells were misinformed on the law of domicile. After speaking with his accountants, Gene believed that he only had to do five things to change his domicile. These factors, standing alone, would likely be insufficient to establish an actual change of domicile as they do not mention physical presence or intent. The KDOR did not explore Rita's beliefs regarding change of domicile at trial, but they are immaterial. A person's legal stipulations or beliefs do not bind the court, and this case presents a good example of why that rule exists.

Even if the district court had accepted that Rita's domicile during the assessment period was Kansas, it did not have to find that Gene was also domiciled in Kansas if there was "affirmative evidence to the contrary." K.A.R. 92-12-4a(b)(5). As is evident in its decision, the district court found affirmative evidence contradicting the conclusion that Gene and Rita were domiciled together in Kansas.

The KDOR argues that the district court erred by raising the issue of Rita's domicile because the parties did not dispute that Rita was domiciled in Kansas. The KDOR also argues that for Gene to avoid application of the presumption, he "had the burden of proof to establish by a preponderance of the evidence, not that Rita lived in

Florida (her Kansas residence was an indisputable fact) *but that he lived apart from her*, which he and Rita both denied." The majority accepts these arguments, holding that because Gene and Rita "did not consider themselves a married couple, separate and living *apart* in 2005 and 2006, there existed a presumption that Gene's domicile would have been the same as his wife, Rita." Slip op. at 15. The majority concludes that the district court improperly shifted the burden onto the KDOR to disprove that Rita was domiciled in Florida during the assessment period.

As stated above, courts are not bound by stipulations of law. "Underlying the rule is the rationale that if this court were to be bound by an erroneous stipulation of law, then an erroneous concept of the law espoused by one or more of the parties would compel the court to adopt an erroneous precedent." *State, ex rel., v. Masterson*, 221 Kan. 540, 551, 561 P.2d 796 (1977). The KDOR wanted the district court to be bound by an erroneous stipulation of law—that Rita's legal domicile during the assessment period was Kansas. The facts do not support such a conclusion.

The KDOR's argument is also problematic because it equates a person's claimed domicile with a person's legal domicile. It treats the fact that Rita claimed Kansas domicile as indisputable evidence that she actually lived in Kansas. This ignores the reality that a person may claim a domicile that is not actually his or her legal domicile. As the KDOR noted in a brief before the district court, designating oneself as a nonresident in a tax return only requires checking a box, "[I]t does not involve the actions that normally accompany a change in a person's place of abode." The KDOR's argument is also ironic given the crux of this case is the KDOR's challenge to Gene's claimed Florida domicile.

Relying on this false equivalency, the KDOR argues that because Rita claimed to be domiciled in Kansas, she must have lived there and Gene had to prove that he lived

55

apart from her. Gene testified that he and Rita never lived apart, so the KDOR concludes that he cannot satisfy his burden of establishing that he lived apart from Rita's claimed Kansas domicile. The majority agrees. I find this argument unpersuasive—not only because it hinges on a false premise—but because sufficient evidence supports the district court's finding that the Bicknells were each domiciled in Florida during the assessment period. It is quixotic to require Gene to prove that he lived separately from Rita in Kansas when the evidence shows that Rita did not live in Kansas at all.

Finally, the majority again faults the district court for noting no evidence showed that Rita maintained a Kansas residency. As with the issues above, the majority found that commenting on the lack of evidence supporting a proposed finding improperly shifts the burden of proof. I have already stated my reasons for disagreeing with this line of reasoning. It was appropriate for the district court to comment that it would need "some degree of proof she maintained a Kansas residency" before applying the presumption, especially given the substantial evidence showing that Rita was domiciled in Florida. In fact, the district court likely would have committed a reversible error of law if it had relied on the stipulation that Rita's domicile was in Kansas rather than deciding the issue independently. See *Urban Renewal Agency v. Reed*, 211 Kan. 705, 712, 508 P.2d 1227 (1973) (reversing district court for basing its holding on an erroneous stipulation of the law between the parties).

### E. The district court did not rule that BOTA's decision was automatically invalid.

Although the majority did not address this point, KDOR also argues that the district court destroyed the presumption of validity that BOTA's order should have held when the district court determined that BOTA's issuance of a summary decision rather than a full decision ignored the law. The district court was very critical of the summary decision. The court stated:

"A plain reading of [*Bicknell II*, No. 111,202, 2015 WL 5613069 (Kan. App. 2015) (unpublished opinion),] includes a direction COTA demonstrate application of applicable KDOR administrative regulations. BOTA ignored this directive. That order was binding as to BOTA as the successor of COTA. . . .

. . . .

". . . Despite the strong language employed by the COA directing specificity, BOTA deems the following as compliance with the order of remand: 'After application of the applicable KDOR regulations, statutes and case law to the record evidence, pursuant to the instructions of the Kansas Court of Appeals the Board finds that the taxpayers [have] not presented evidence to satisfy their burden to show satisfactory proof that Mr. Bicknell acquired a new domicile in the State of Florida during the period at issue.' It is respectfully submitted this conclusory statement not only defies the COA directive, it is difficult to perceive how any appellate body under any standard of review could ascertain whether substantial evidence supported the BOTA decision."

Later in the opinion, the court found that "[w]ith a BOTA summary decision, which merely repeats the COTA determination without analysis, it is difficult to view either one of these regulatory agencies as anything other than a rubberstamp of the KDOR."

While the district court disagreed with BOTA's decision to issue a summary decision, it also acknowledged that BOTA had the right to do so under K.S.A. 74-2426. The court also acknowledged that taxpayers can request a more detailed decision from BOTA. The court cited the option of issuing a summary decision as "further indication that the legislative intent was for a true *de novo* appeal." Remanding a summary decision, the court stated, would "precipitate unwarranted and unnecessary delay" because "[t]he nature of the order is irrelevant if the appeal is a true *de novo* hearing."

57

Regardless of the district court's statements about the summary decision, the court did not reverse BOTA's decision on that basis. If the court thought review was impossible without a full decision, then it would have remanded the case to BOTA with directions to write one. Yet the court did not invalidate and remand BOTA's order because the court conducted a new trial and any further commentary from BOTA would have been immaterial to the de novo proceeding. Further, even if the court held that BOTA's summary decision was invalid, the court analyzed the substantive factors governing domicile.

The KDOR conclusively states that the district court's invalidation of BOTA's order shifted the burden of proof to the KDOR. This is not supported by the record. The district court did not invalidate BOTA's decision or ever state that it was shifting the burden of proof.

II.     THE DISTRICT COURT DID NOT ERR BY CONDUCTING A TRUE TRIAL DE NOVO

I agree with the majority on this point, for the reasons stated in its opinion.

III.    THE DISTRICT COURT ERRED IN FINDING THAT VENUE WAS APPROPRIATE IN CRAWFORD COUNTY, BUT THE ERROR DOES NOT REQUIRE REVERSAL AND REMAND

I agree with the majority, for the reasons stated in its opinion that venue was not appropriate in Crawford County, but I do not believe this error requires reversal and remand.

Improper venue does not always require remand. In *Jones v. Insurance Co.*, 83 Kan. 682, 112 P. 826 (1911), W.H. Jones brought suits to recover upon several insurance policies after a fire destroyed his merchandise. Before the trials, the insurance companies

filed motions for change of venue asserting that the district court judge was disqualified for having a financial interest in the case. The court denied the motions. The cases were each tried to the same jury, and the jury returned verdicts in favor of Jones in each case.

On appeal, the Kansas Supreme Court held that "[a] change of venue ought to have been granted in each of the cases." 83 Kan. at 685. But the court held that the error was harmless. The court noted that "[a]t the trials the [insurance companies] produced evidence amply warranting recovery." 83 Kan. at 686. There were few evidentiary objections, and those that were made were inconsequential. The court also reasoned:

> "The conclusion to be drawn from this decision is that, when upon an appeal to this court the record of the proceedings shows with reasonable clearness that the judgment rendered expresses the only result which could rightfully be reached, the defeated party has not been prejudiced in his substantial rights because his motion to change the venue was denied, and he was obliged to go to trial before a judge who was disqualified.

> ". . . Shocking as the notion of a trial before an interested, prejudiced, or otherwise disqualified judge may be, the law is practical and will not compel another trial merely to gratify a sentiment or to uphold a principle. If the party applying for the change of venue should win the case, he is not permitted to say that his substantial rights were prejudicially affected by the erroneous ruling. If the facts should be agreed to and the judgment which the law requires should be pronounced upon them, no possible injury could follow from the refusal to change the venue. Many other situations can be imagined in which a ruling of the kind complained of would be harmless, and if the record should show that the party applying for the change had no defense to a well-proved, meritorious cause of action, it would be to indulge litigiousness at the expense of justice to remand the cause, in order that the same adverse result might be stated in another court. Ordinarily, therefore, it is unavailing for a party, on appeal, to stand upon a well-

grounded motion for a change of venue. If he brings up nothing but the ruling on his motion and the final judgment against him, the court cannot say that prejudicial error is made manifest." 83 Kan. at 687-88.

Likewise, in *Alliance Life Ins. Co. v. Ulysses Volunteer Fireman's Relief Assn.*, 215 Kan. 937, 529 P.2d 171 (1974), the Kansas Supreme Court found that improper venue was harmless error. There, the court held that McPherson County was not a proper venue to litigate a life insurance policy dispute because it was not the county in which the action arose. 215 Kan. at 938-39. Although the district court erred in overruling the defendant's objections to venue, the error was harmless. The court stated: "Although a party's right to litigate in a proper forum is a valuable one, the law does not require pointless redetermination of legal issues where the results may be readily foreseen." 215 Kan. at 942. Unlike this case, the court decided *Alliance Life* solely on stipulated facts. 215 Kan. at 942-43.

Harmless error for improper transfer of venue was also found in *Rhodenbaugh v. Kansas Employment Sec. Bd. of Review*, 52 Kan. App. 2d 621, 372 P.2d 1252 (2016)—a KJRA case. The parties submitted *Rhodenbaugh* to the court solely on briefs tied to the administrative case record. On appeal, this court held that the district court improperly granted a motion to change venue. Even so, this court believed that remand was "futile" because "the only difference would be which judge would review the agency action, but Rhodenbaugh has not alleged that the Shawnee County judge who decided her petition for judicial review was biased or otherwise unfair." 52 Kan. App. 2d at 629. Further, neither party contended that the error affected the outcome of the case.

The party benefitting from an error has the burden of showing that it is harmless. *Matson v. Kansas Dept. of Corrections*, 301 Kan. 654, 659, 346 P.3d 327 (2015). The Bicknells benefit from any error of improper venue. The Bicknells note that while this case was tried in Crawford County, the case was not heard by a Crawford County jury or

a Crawford County judge. The Kansas Supreme Court appointed Senior Judge William Elliott, who heard the KDOR's motion to dismiss, and Senior Judge Richard Smith, who heard the rest of the case. The Bicknells argue that this case is like *Rhodenbaugh* because the KDOR does not raise any arguments of bias or misconduct on behalf of the judges appointed. The KDOR also makes no argument, either in its initial brief or reply brief, that the outcome of the case would have been different had venue been in Shawnee County.

There is no reason not to apply the reasoning of *Rhodenbaugh*. An appointed judge heard this case and there is no allegation that the outcome of the case would have been different in Shawnee County. Unlike *Rhodenbaugh* and *Alliance Life*, this case was not presented solely on stipulated facts or an already-established record. Some of the testimony was live, including testimony from the Bicknells. There were also several depositions read into the record, as well as many exhibits. Because there is no indication that the proceedings were influenced by the venue decision, I would find that any venue error was harmless.

For these reasons, I would not reverse the district court because it improperly shifted the burden of proof or lacked venue.

My position requires that I address the other issues raised by the parties that the majority did not need to address based on its holding. But first, for context, more facts as presented through eight days of trial testimony are necessary.

IV.    SUPPLEMENTAL FACTS ARE PROVIDED FOR CONTEXT

A.  *Gene's life story is told.*

Gene Bicknell was 85 years old at the time of the hearing. While he was born in Oklahoma, he moved to Kansas at a young age and remained there for most of his life. He married in 1956, although he later divorced. He has five children who live in the Kansas and Missouri area, and 23 grandchildren and great grandchildren. Gene has long maintained a home in Pittsburg. Gene also owns a cattle and farming operation called Bicknell Farms, although he has very little involvement. A farm manager, Ronald Hobbs, oversees the farm operation.

Throughout his life, Gene was very involved in the Pittsburg community. He was elected as mayor in Pittsburg, served as president of the school board, participated in many community organizations, and served in various roles at Pittsburg State University. Beginning in 1991, Gene hosted an annual charity golf tournament in Pittsburg. The tournament ran until 2005. Gene and Rita were also very involved with their church in Pittsburg and provided over half of the church's budget. At the trial, Gene said that he maintains "close ties to the Pittsburg community."

Gene got involved in the pizza business in 1962 when he bought his first Pizza Hut restaurant. Gene's company, NPC International, would go on to become the largest Pizza Hut franchisee in the world, with 800 stores and over 22,000 employees. NPC's operations were based in Pittsburg. In 1997, Gene also established a company called NPC Management in Pittsburg which housed the administration, support, and management personnel who were not part of the core restaurant operations. Gene was also involved in many other entrepreneurial endeavors. One of these was Pitt Plastics, a company that

makes polyethylene bags. Gene started Pitt Plastics in the early 1970s. Gene testified that he relinquished his responsibilities with Pitt Plastics some time in 2002.

For over 40 years, Gene's assistant was Karen Badart. She lived in Pittsburg. Gene described Badart as his "right arm"—she kept records, filed documents, arranged appointments, handled mail, bills, and insurance dealings, and anything else Gene needed for his businesses. Badart had a signature stamp with Gene's signature that she could apply. Badart herself had an assistant named Cindy Morris.

In 1987, Gene met Rita in Pittsburg. Gene and Rita bought a house in Englewood, Florida, on Manasota Key in 1990. Gene testified that when they bought the house it was their dream to eventually retire and live there. Over the next two or three years, they remodeled the home. Gene and Rita got married at their Florida home in 1994. In 1995, Rita passed the bar exam and began working at a small general practice law firm in Kansas.

In the late 1990s, the Bicknells moved some items from their Pittsburg home to their Florida one. The items included antique furniture, rugs, artwork, memorabilia, family photographs (including the Bicknells' wedding album), china and crystal, clothing, and personal effects. The Bicknells' farm manager transported the belongings to Florida in a horse trailer. The Bicknells did leave some furniture in Kansas, and Gene explained that this was because the Kansas furniture was too formal to fit in with the Florida house.

At the time of trial, the Bicknells had both their Pittsburg house and their Florida house. The Pittsburg house had been for sale for some time, including during the assessment period, but the Bicknells had been unsuccessful in finding anyone to purchase it. At one time, they considered donating it to Pittsburg State University. In 2005, Gene

installed a new swing set at the Pittsburg home for his grandchildren as they were still visiting the house.

When the Bicknells first bought the Florida home, they were both working. At first they would visit the Florida house for a few days or a week. As time passed, these stays became longer. Gene testified that he decided to become a legal resident of Florida in 1999. He thought he could arrange to take care of his business affairs so that he could live in Florida. Gene asked his accountants what he needed to do to become a Florida resident. He testified:

> "Well, I checked with my accountants and my people and there were five things, according to the statutes, that I needed to do to become a Florida resident. One was to have a residence; two, was to have an automobile; three, was to have a driver's license; four, was to have a bank account; and five, was to vote in that state."

Gene did not ask the KDOR what constituted a legal change of residence, and he did not read the Kansas regulations pertinent to the subject. At that time, Gene already had a residence and automobile in Florida. Based on the advice he received, Gene obtained a Florida driver's license and registered to vote in August 1999. But he did not open a Florida bank account until January 2003. In 1999, Gene also joined a couple of country clubs near his Florida home, and he was an avid tennis player and golfer. Rita said she and Gene were "[v]ery active" in the Florida country clubs since they joined. He and Rita had many friends in Florida, including friends from Pittsburg, who have houses in Florida and live there either full or part time.

Gene filed his 1999 Kansas income tax return as a nonresident, stating that he was a resident of Florida. When he entered 2000, he "absolutely intended to live in Florida." He voted in Florida in March and November 2000.

NPC acquired 200 more Pizza Hut restaurants in 2000. Gene owned 65 percent of NPC stock, but in December 2000 he made an offer for the other 35 percent of the company. Gene explained that he did not have to be in Kansas to make the offer, and that "[his] people" did the work in preparing the offer.

By the end of 2000, Gene decided to return to Kansas. While he had tried to wrap up his business affairs prior to moving to Florida, Gene realized over the course of the year that there were "too many loose ends, and [he was] going to have to go back and get this tied up." He explained that he "misplanned on how to become a person living in Florida. And it became obvious to [him] that there were a lot of loose ends that needed to be tied up." So, he "spent 2001 and 2002 getting that situation reversed." In December 2000, Gene obtained a Kansas driver's license and registered to vote in the state. Later, he filed his Kansas income taxes as a resident for 2000, 2001, and 2002.

By the beginning of 2002, Gene believed he had mostly straightened out his business affairs. He had sold or given away some of his companies and ensured that management was in place at others. He voted in Kansas in July 2002, but it was the last time that he would vote in the state.

In late summer or early fall of 2002, the Bicknells hired a housekeeper, Joan Waters, to look after the Bicknells' Pittsburg home. She lived in a guest house on the property. Rita explained that they hired Waters to take care of the property because they were not spending much time in Pittsburg. Waters was still living at the Pittsburg residence at the time of trial. Ronald Hobbs, the Bicknell Farms manager, tended to the yard and pool. Hobbs testified that, in this time frame, the Bicknells did not handle issues on the property themselves because they were usually gone for months at a time.

Gene testified that he officially retired in Florida in January 2003. His definition of retirement is "doing the things I want to do and not what I have to do." Gene explained that there were a couple major contributing factors to his decision. First, when Gene turned 70 years old in September 2002, he realized he was getting older and that he was prepared to retire. Second, Rita's doctors diagnosed her with breast cancer in December 2002 and Gene was not going to leave her during her treatment. Gene did not send a memo or otherwise announce to his colleagues that he retired to Florida in January 2003. He did not think it was necessary to do so since the people he interacted with already knew what he was doing.

Gene lived with Rita at their Florida home during Rita's treatment and convalescence. Her treatment lasted for all of 2003 and part of 2004. Gene testified that he continued to cut back on his business interests throughout 2003. In January 2003, Gene applied again for a Florida driver's license. He continued to carry that Florida license through the time of the trial. In December 2003, he signed an irrevocable trust agreement specifying that his residence was in Florida and that Florida law should apply to the agreement. The Bicknells spent Thanksgiving and Christmas in Florida. Gene filed his 2003 Kansas tax return as a nonresident. Gene did buy another vehicle, a Thunderbird he was saving to become an antique, and he registered in Kansas in 2003. In 2004, Gene registered another vehicle in Florida and garaged it at his home there.

Gene had long enjoyed singing, acting, and entertaining. While attending to Rita during her recovery, Gene wrote a script for a musical production he called Celebrate America. In April 2004, Gene began performing Celebrate America in Branson, Missouri. Gene was the lead character in the performance. Celebrate America was performed at a theater called The Mansion, which Gene owns. While he was in Branson, Gene stayed in an apartment in the theater. The show season ran from April to December, although there were a couple of weeks in August and a week or two before Christmas that

66

the theater was closed. Celebrate America ran six days a week, with Monday being an off day. Celebrate America ran for the full 2004, 2005, and 2006 Branson theater seasons.

In August 2004, Gene applied for a Kansas driver's license in Pittsburg despite filing his taxes as a Kansas nonresident. He explained that he did this because he got a renewal notice in the mail and he "assumed that Kansas knew what they were doing." He could not recall anyone asking him if he was a Kansas resident or if he carried a driver's license from another state. He testified that he "went to the license office, gave them the notice they sent me, they gave me a little questionnaire, took my picture, but at no time did they ever ask me if I was a resident of any state." Gene did not think he had to be a resident of Kansas to get a driver's license and explained that twice in his life he had maintained two different driver's licenses (once when he had a chauffeur license, and once when he had a military license). After obtaining the license, he stored it in a desk drawer in Florida and never carried it.

The KDOR rebutted Gene's testimony with testimony from Laura Krom, a driver's license specialist at the driver's license office in Pittsburg. She recalled issuing the 2004 Kansas driver's license to Gene because he was well-known in the area, in her words a "celebrity." Krom testified that she asked him if he still lived at the Pittsburg address on the renewal notice and that he responded "'yes.'" She also testified that she asked him if he had a driver's license in any other state and he responded "'no.'" Finally, she testified that Gene responded "'yes'" to a question on the renewal application that asked him if he was a Kansas resident.

The next month, in September 2004, Gene reregistered to vote in Florida. He voted in the 2004 general election.

In 2005, Gene participated in the Food and Beverage Task Force at the Mission Valley Country Club in Florida. He presented a report to the task force in February 2005 at a board and general membership meeting. In October and December 2005, Gene executed new trust documents listing his Florida address and providing for Florida law to apply.

In January 2006, Gene applied for a Florida homestead exemption from the Sarasota County Appraiser's Office. He found out about the exemption from his neighbors. Before granting Gene the exemption, the Sarasota County Property Appraiser's Office that processed the application verified that Gene was the owner of record for his Florida home, and also verified Gene's Florida driver's license, motor vehicle registration, and voter registration.

Gene never planned to sell NPC International. Even so, in the latter part of 2005, Merrill Lynch approached Gene about purchasing the company. Gene met with representatives from Merrill Lynch in Kansas City about the potential sale soon after. Gene participated in later negotiations from Florida. By early 2006, Gene had decided to sell the company. The sale closed in May 2006. In the sale, Gene made a provision that NPC's main offices were to remain in Pittsburg. Gene did not have any role with NPC after the sale. He donated some of the proceeds from the sale to charity and gave the balance to his son Marty Bicknell (Marty) to invest.

Before the sale of his company, Gene had acted as both CEO and chairman of the board at NPC International and NPC Management. His duties as CEO included attending board meetings, occasional phone calls, stopping by the office if he was in Pittsburg to check in, approving bonus payments to executives, and reviewing business investments. As chairman of the board, Gene presided over quarterly meetings. This included setting an agenda, directing conversation, and reviewing documents. Gene relinquished his role

68

as CEO of NPC International in December 2004 but remained chairman of the board until April 2006. Gene did not relinquish his role as CEO of NPC Management until April 2006, and after selling the company the next month he was no longer chairman of the board. Gene attended most board meetings in person between 2002 and 2006. There was testimony that Gene was also conducting business by phone before selling his company in 2006.

Shortly after the sale of NPC, Gene's son Marty established a company called Mariner Wealth Advisers. In July 2006, Gene executed a special durable power of attorney in favor of Marty and Mariner Wealth Associates. Gene explained that he did this so Marty "could look after the businesses and [Gene] wouldn't have to." Gene was a client and investor at Mariner but was not involved with Mariner's operations when it began. But shortly after Mariner was formed Gene took a 30 percent ownership interest in the company. In January 2007, Marty asked Gene to serve as a consultant for him at Mariner, and Gene accepted. In his role as consultant, Gene offered advice and Marty would call him almost every day. While Mariner provided an office for Gene in Pittsburg, Gene was rarely there.

Gene gave Marty power of attorney to run his remaining companies in July 2007. Marty explained that the purpose of the durable power of attorney was so that Marty "could continue helping those companies and operating them and . . . in [Marty's] words, cleaning up some of the messes." Marty assumed full management for all of Gene's companies after Gene executed the durable power of attorney. Marty also assumed oversight of Bicknell Farms and the Pittsburg house.

Soon after, in September 2007, Gene received notice of the KDOR's desk review of his 2005 and 2006 taxes. Gene was surprised to receive the notice.

*B. Evidence of Gene's physical presence is presented and contested.*

       *i.    Testimony*

As expected, establishing where Gene was physically present during the assessment period in 2005 and 2006 was a major focus at the trial. Gene was in Branson performing Celebrate America for much of the duration of the assessment period. Yet the parties never contended that Missouri was Gene's legal residence during that time. The focus was on whether Florida or Kansas was Gene's legal residence. The evidence on where Gene spent his time outside Branson is conflicting, as each party understandably tried to prove where Gene was domiciled. Gene did not keep a personal calendar, and neither did his assistant Badart. The evidence mostly consists of testimony from the Bicknells and those familiar with them, the Bicknells' responses to the KDOR's nonresident questionnaire, and Gene's use of his Pittsburg address on various documents, among other things.

Gene testified it was his normal practice to visit family in Pittsburg for Christmas, and to stay in Florida between Christmas and the beginning of the new theater season. Rita testified that when Gene was not in Branson, he was with her in Florida. Gene admitted to visiting Pittsburg but explained that he would only do so if there was a reason to be there such as a meeting or family event. For example, Gene sat on the board of University Bank in Pittsburg and its meetings were usually on late Monday afternoon (the off day in Branson). Gene testified that he would usually drive to Pittsburg from Branson in the morning and return to Branson after the meeting. When asked how much time he spent in Kansas in 2005 and 2006, Gene responded that in those years he spent most of his time in Branson and his days in Kansas were "very few." He estimated that he "probably didn't average 30 days a year" in Kansas during those years.

Gene's testimony was supported by those closest to him, including his family and associates. Rita corroborated Gene's testimony that he wanted to live in Florida, and sought to do so in 1999, but his work prevented him from living in Florida full time until January 2003. Rita testified that since 2003, she and Gene have visited Pittsburg for family activities, including graduations, birthdays, and early Christmas celebrations. Marty, who communicated "[v]ery frequently" with his father, knew that Gene planned to reduce his business involvement and make Florida his legal residence. Marty testified that he believed that his father became a Florida resident in 2003, and that Gene was not in Kansas very often in 2005 and 2006. Since 2002, Marty testified that Gene used the Pittsburg house "very infrequently."

Badart also testified that Gene started spending more time in Florida than Kansas in the early 2000s. She knew that he was living in Florida since the "[t]he first part of 2003," and had been living there since that time. Morris, who had been working for Gene since 1991, noted that he used to be "pretty accessible" if she needed to set up a meeting with him. That changed around 2000 because Gene was not in the office as often. Between 2000 and 2006, Morris thought Gene's availability for personal meetings was "[v]ery little." She usually had to contact him by phone. Most of the time, Morris testified, Gene was in Branson. But when he completed his work on the production, he would go to Florida. He still visited Kansas for events, but "[t]here would have to be a certain purpose for him to return to Kansas." If Gene did not have any engagements in Kansas or Branson, he would be in Florida. Similarly, Troy Cook (hereinafter "Mr. Cook" to distinguish him from Jenika Cook) said that Gene's "accessibility was increasingly less over time" beginning around 2000. Mr. Cook testified that "everybody" who had regular contact with Gene "knew that Gene had moved his residency to Florida at some point" around 2003 to 2006.

71

Hobbs and Waters, who had frequent contact with the Bicknells' Pittsburg home as its caretakers, both testified that after 2002 the Bicknells stayed in Florida unless they had business or family functions in Kansas.

### ii. Gene's responses to KDOR's nonresident questionnaire

There was also discussion about Gene's 2007 responses to the KDOR's nonresident questionnaire. The questionnaire stated that "[t]he taxpayer(s) or representative should complete this questionnaire and provide information for the tax year(s) in question." It asked Gene to "list the days or part days that [he was] physically present in Kansas" and Florida from 2004 through 2006. Gene responded:

|      | Kansas   | Florida  |
|------|----------|----------|
| 2004 | 111 days | 111 days |
| 2005 | 113 days | 117 days |
| 2006 | 111 days | 134 days |

The response specified that it was compiled by using Gene's credit card charges, flight records, long distance records, and personal accounts.

When asked about the nonresident questionnaire, Gene explained that he relied on Mariner for help responding to the audit. He did not know who accumulated the numbers for the response. Gene also denied signing the questionnaire and could not recall reviewing it before it was submitted. He said the answers were not his—"[t]hese were filled out and I don't have any identification here as to who filled them out." He explained that having someone else take care of his paperwork is simply how he functioned.

72

When Gene asked Mariner to handle the nonresident questionnaire, Marty delegated the responsibility of completing the nonresident questionnaire to a group of accountants in the office led by Jenika Cook (hereinafter "Ms. Cook" to distinguish her from Troy Cook). Badart assisted by providing Ms. Cook with checks, receipts, bills, and other documents, but Badart did not fill out the questionnaire. Rita recalled Ms. Cook and Badart asking her occasional questions while they were responding to the KDOR's requests for information, but Rita could not recall looking at the nonresident questionnaire. When Ms. Cook was finished completing the questionnaire, she gave it to Badart and asked Badart to get it signed. When Badart told Gene, Gene told her to "'handle it.'" When Gene would tell Badart to handle something, it meant that she had authority to sign his name, so she signed the nonresident questionnaire on his behalf. Ms. Cook had only known the Bicknells for about a year when she worked on responding to the nonresident questionnaire.

### iii. Gene's business filings and mailing addresses

The KDOR also presented Secretary of State filings showing Gene was the resident agent for several Kansas companies during the time he was purportedly living in Florida. Until the time of trial, however, Gene "had no idea" what a resident agent was or what the agent did. He believed that if he is a resident agent of a company and he moves to another state, it was "not [his] responsibility to worry about changing resident agent." Gene suggested that whoever filled out forms for him may have been basing his address on past forms.

Gene reviewed some of these filings at the trial and testified that he did not sign many of them. Sometimes when Gene's businesses had to make required filings with the government, including annual reports, Gene directed Badart and Morris to "[t]ake care of it." Badart and Morris both signed these filings on Gene's behalf. Badart testified that

73

when she signed annual business registration reports, they were "usually already filled out by either the accountants or the CEO or the president of different companies that Gene was involved in." If Gene was present, she would have him sign as needed. More often, Gene was absent and would tell Badart to "'handle it.'" Similarly, Morris testified that sometimes the forms would already be filled out and other times she had to fill them out. When Morris had to put an address on a document, she would usually use her Pittsburg office because she wanted it to be the contact address for any further business. If documents were mailed directly to Gene, she testified, her job would have been "[m]uch harder." Badart also used her Pittsburg address on business documents "[b]ecause everything business wise was going to come back to [her] anyway."

The KDOR also presented evidence that Gene continued to receive mail at his Pittsburg home during the assessment period. For example, his 2006 W-2 from NPC Management was sent to his Pittsburg home. However, Mr. Cook suggested that the form was sent to Gene's Pittsburg address because the company failed to change Gene's place of domicile in its payroll system when he left Kansas. Gene explained that he received mail at many addresses, but he was not concerned because mail sent to each address was supposed to be provided to Badart, and Badart would "run[] it through the funnel." Since 2003, Badart has forwarded personal mail to Gene at his Florida address.

### iv. Gene's country club memberships and activity

Evidence of Gene's membership and use of country clubs in Kansas and Florida also added to the discussion of Gene's whereabouts during the assessment period. Gene has long been a member of Crestwood Country Club in Pittsburg and was still a member at the time of trial. The Bicknells kept the account open because it is convenient to have a place to go out when they visit Pittsburg, and also because they let other people charge on

74

the account. Gene has also been a member of the Mission Valley Country Club in Florida since 1999.

The KDOR introduced records from the Florida and Pittsburg country clubs showing that when Gene signed up with the Florida club in 1999, he listed his Pittsburg address as his primary residence and his Florida address as his secondary residence. Between 2003 and 2011 the Florida club listed Gene's Florida address and Pittsburg address in its membership roster. The Florida address was always listed first.

The KDOR also questioned Rita about a statement she made on an information sheet submitted to the Bicknells' Florida neighborhood association (the North Manasota Key Association). The sheet was to be filled out with information for the association's 2003 directory. Rita listed the Florida address as a winter address, and the Pittsburg address as a summer address. She also wrote a note at the bottom of the sheet that said, "[L]ooking forward to seeing everyone this winter." When asked why she would write that when the Bicknells were purportedly living in Florida in 2003, she explained that a lot of their neighbors were only in Florida in the winter and she was looking forward to seeing them.

A similar statement appeared in a February 2006 newsletter for the Mission Valley Country Club. Writer Helen Kelly interviewed Gene at the club and published an article about him. In the article, Kelly stated: "'Gene and Rita, who has a law degree from Washburn University, have been members of Mission Valley for over two years residing in the winter on Manasota Key, Englewood.'" Kelly testified that she wrote the statement because it was what Gene told her.

### v. Rita's residency

The topic of Rita's residency was also discussed during the trial. Both Rita and Gene said that Rita did not change her residency from Kansas to Florida until 2008. Even so, the Bicknells both testified that Rita lived and was physically present in Florida since January 2003. Gene said that Rita "maintained a Kansas residency, but her heart and physical presence was in Florida most of the time." In 2003 and 2004, Rita was convalescing at the Bicknells' Florida home. She did "very little" for her law practice after 2003. Rita explained that she did not declare herself a Florida resident until 2008 because she was involved with Kansas politics and wanted to vote there. She said by 2008 she and Gene were both in Florida, so she decided to "complete the step" to changing her residency.

### vi. Church

The KDOR also questioned the Bicknells about their church participation as church participation was important to Gene. Gene and Rita started attending First Baptist Church in Pittsburg when they first met. They became very involved with the church and ended up providing about half of the church's budget. The Bicknells did not end their support of the Pittsburg church after moving to Florida since they were providing so much of the budget. The Bicknells were also both trustees at First Baptist Church in 2005 and 2006. Gene attended a trustee meeting in June 2005 and one in August 2006. In December 2006, the Bicknells attended the church's annual budget meeting and Rita presented the projected church budget for 2007. Gene explained at trial that those meetings occurred on Monday night, and that was the night he was not working at the theater. He and Rita would drive to the church from Branson.

76

Gene testified it took "quite a bit of time" to find a suitable church in Florida. They just could not find a church in which they felt comfortable. The Bicknells did not formally join a church there until after 2012. Gene is one of two ordained deacons at the Florida church, he heads the finance committee, and serves as a trustee and moderator. The Bicknells were actively involved in a Florida church at the time of the trial.

### C. *The district court's opinion is entered.*

The district court issued a 53-page opinion ruling for the Bicknells, finding that Gene's domicile was Florida during the assessment period. The court began by revisiting its holding on the de novo nature of review it exercised. The court then reviewed Kansas law on domicile, including the controlling statutes, regulations, and caselaw. The court noted that credibility was vital here due to the "oppositional interpretation subjected to nearly every shred of evidence" by the parties. The court separated its factual findings into general findings on Gene's motive and intent, specific findings on each applicable factor listed in K.A.R. 92-12-4a, and findings on statutory presumptions. I will elaborate on these findings below.

## V.    THE DISTRICT COURT DID NOT IMPROPERLY APPLY KANSAS LAW ON DOMICILE

The KDOR argues that the district court failed to follow Kansas law on domicile. The KDOR reviews the statutes, regulations, and caselaw that establish Kansas law on domicile. Then, it asserts that the district court did not apply Kansas law, but used "'Gene's law.'" This refers to Gene's testimony that he

> "checked with [his] accountants and [his] people and there were five things, according to the statutes, that I needed to do to become a Florida resident. One was to have a residence; two, was to have an automobile; three, was to have a

77

driver's license; four, was to have a bank account; and five, was to vote in that state."

The KDOR also argues that the court erroneously relied on Gene's recollection of the introspection he engaged in before deciding to retire and move to Florida full time. Lastly, the KDOR argues that the district court refused to consider the objective facts and evidence showing Gene's significant connections to Kansas.

A district court's interpretation and application of the law is subject to unlimited review. *Johnson v. Brooks Plumbing*, 281 Kan. 1212, Syl. ¶ 2, 135 P.3d 1203 (2006).

A. *The district court properly applied Kansas law, not "Gene's Law," to its domicile determination.*

The KDOR's first argument is that the district court adopted Gene's test for domicile rather than apply Kansas law. The KDOR cites excerpts from the court's decision when the court analyzed K.A.R. 92-12-4a(b)(7)(B)—the location of the person's domicile for prior years. In its analysis of this factor, the court held that it was "sufficiently persuaded that Gene's intent to be a Florida resident coincided with objective indicia of that intent such, that Florida was Gene's residence by the time he decided to effectuate a change back to Kansas in late 2000." The KDOR alleges that the court found a change of domicile (first to Florida in 1999, then to Kansas in 2000, then back to Florida in 2003) based solely on Gene's personal desire, voter registration, and driver's license applications, and without finding any evidence that Gene physically relocated. Further, the KDOR complains that the parties stipulated that Gene was a Kansas resident before 2003 so it was improper for the district court to suggest that the facts were other than those stipulated.

78

Kansas law defines "'domicile'" as "that place in which a person's habitation is fixed, without any present intention of removal, and to which, whenever absent, that person intends to return." K.A.R. 92-12-4a(b)(1); see *Ford, Adm'x, v. Peck*, 116 Kan. 74, 76, 225 P. 1054 (1924) ("There must be a transfer of bodily presence to another place, represented in the statutory definition by adoption of a place of habitation; and there must be intention to abide at the new location, either permanently or indefinitely, represented in the statutory definition by intention of returning when absent."). K.A.R. 92-12-4a(b)(7) sets forth many factors to consider in determining whether a person has a Kansas domicile.

A review of the district court's decision shows that it properly considered Kansas law, and that its analysis was not limited to the five factors Gene enumerated. The district court recognized this and stated that while intent is important it must coincide with physical presence. The court found that Gene's motive "coupled with physical presence and an intent to make the chosen domicile his residence, indefinitely" was what caused Gene's change of domicile, not Gene's internal decision. The court specifically stated that it "declined Gene's counsel's suggestion that if Gene's testimony is found to be honest, sincere and believable the court could rule in favor of his position on domicile based solely thereon. Kansas law is clear that such reliance cannot be the sole and only consideration." The court also addressed the pertinent factors from K.A.R. 92-12-4a(b)(7), not just the five factors Gene thought would establish residency.

The KDOR also suggests the court committed reversible error when it found that Gene was domiciled in Florida before 2003 because the parties stipulated that Gene resided in Kansas until 2003. The Bicknells note that while they stipulated that Gene was a Kansas resident before 2003, they did not stipulate that he "was a Kansas resident for all time and all years prior to 2003."

Even if the parties did stipulate as to Gene's prior domiciles, such a stipulation is not binding on the district court. While it is true that a stipulation of fact is binding on the court, see *Klein v. Oppenheimer & Co.*, 281 Kan. 330, 336, 130 P.3d 569 (2006), parties cannot "stipulate '"as to the legal conclusions from admitted facts."' *Urban Renewal Agency v. Reed*, 211 Kan. 705, 712, 508 P.2d 1227 (1973) (quoting 50 Am. Jur., Stipulations § 5)." *State v. Weber*, 297 Kan. 805, 814, 304 P.3d 1262 (2013). Determining Gene's prior domiciles is a legal determination—the court was not bound to adhere to any stipulation as to Gene's prior domiciles. The district court found that Gene's actions in 2000, which included being physically present at his Florida residence, owning a vehicle in Florida, obtaining a Florida driver's license, and registering to vote, reflected Florida domicile. The court also found that Gene intended to live there. This is supported by substantial competent evidence in the record. The district court did not misapply the law.

### B.  *The district court properly considered Gene's testimony that he retired in January 2003.*

The KDOR also challenges the district court's reliance on Gene's testimony on his motivations for moving, and the introspective thoughts to which Gene testified. Gene testified that on his 70th birthday, he woke up feeling "pretty old" and thought about how several family members had passed away. Gene said that these thoughts contributed to his decision to retire and make Florida his permanent residence. As to this testimony, the district court stated:

> "In 2002, Gene turned 70. He experienced an unusual amount of introspection due to the relatively recent loss of a number of close relatives and some new health problems of his own. The veracity of this self-reflection requires specific discussion. On this topic and some others KDOR argues that Gene's story is well rehearsed. Admittedly, Gene has had to tell this story on numerous

80

occasions over an extended period. Some of this reception and any fault or blame does not lie with Gene. COTA rendered a decision requiring a remand and KDOR spent substantial time seeking a rehearing, then a review by the Supreme Court. Gene's demeanor in presenting this testimony, under the circumstances, seemed very sincere and believable. Although the court might question whether this introspection alone would have motivated a new choice and domicile, the court is convinced beyond any necessary doubt that the next monumental event solidified that bona fide intent.

"Rita was diagnosed with breast cancer, required radical mastectomy, and she sought treatment and convalescence in Florida. The year 2003 is the bright line demarcation where Florida once again became the chosen domicile. Kansas had been the previous domicile for only a short period."

The KDOR argues that Gene's testimony about retirement conflicts with the facts, asserting that Gene continued to work and earn money in Kansas, that he did not involve his son Marty in his business until 2006, and that Gene did not retire or reduce his Kansas workload. The KDOR asserts it was error for the district court to rely on Gene's introspective thoughts.

The district court did not rely only on Gene's introspective thoughts in forming its conclusion that Gene was domiciled in Florida during the assessment period. There was ample testimony that Gene began physically residing in Florida, returning there after the Branson show season, and withdrawing from his businesses. The Bicknells testified that Gene stayed with Rita in Florida during her convalescence, and the KDOR did not introduce any evidence to dispute this. Neither did the KDOR dispute that Gene spent most of the assessment period in Branson. This evidence conflicts with the KDOR's assertion that Gene had to be in Kansas working because he was earning income from his businesses during that time. The KDOR did not have any evidence that Gene had to be

81

physically present in Kansas to work. Thus, the KDOR's evidence that Gene did not retire before the assessment period does not compel a conclusion that Gene was domiciled in Kansas. Whether substantial evidence supports the district court's ultimate conclusion will be discussed later.

The KDOR also argues that "[t]he district court's reliance on Gene's recollection of inner thoughts is radically inconsistent with Kansas law." This is not so. In domicile cases, "'[A]lmost anything that bears on a person's attitude of mind toward a place is admissible in evidence.'" *In re Estate of Phillips*, 4 Kan. App. 2d at 264. It is true that "[s]tanding alone, an expressed intent to remain a resident of a state in which one no longer resides is not necessarily sufficient to retain residency when other facts are present that would indicate a contrary intent." 4 Kan. App. 2d at 264. Intent can be particularly important "when a person's significant course of conduct is closely divided between two or more states," and in that situation, "his stated intent as to the state of his residence may be permitted to tip the scales in favor of that state." 4 Kan. App. 2d at 264. For these reasons, it was proper for the district court to consider Gene's testimony on his thoughts about retiring in Florida.

   C. *The district court did not disregard evidence; it assigned less weight to the evidence than the KDOR desired.*

The KDOR's final argument that the district court misapplied the law is that the court "capriciously disregarded" objective facts and circumstances that showed Gene's domicile was Kansas. The KDOR asserts the district court ignored that Gene's wife, family, church, businesses, friends, and colleagues were all in Kansas. In support, the KDOR cites the conclusion of the district court's opinion.

82

"There are two exceptions where the evidence in context supports KDOR's position. They are (1) the incident at the Driver's License Bureau in Pittsburg and (2) a sentence in an interview for a retirement community newsletter. For reasons previously explained, they alone do not outweigh the other evidence. KDOR, undoubtedly will argue the court has ignored others. That is simply not the case. The other evidence, in context with the evidence as a whole, just does not have the probative value KDOR contends. The overwhelming credible evidence with probative value suggests that Gene was in fact a resident of Florida, not Kansas, in 2005 and 2006."

The KDOR contends this statement is proof that the district court only considered two pieces of evidence the KDOR presented.

It is clear from the district court's opinion that it did consider the KDOR's evidence. The court stated as much when it found that the KDOR's "other evidence," meaning evidence other than the two factors just set forth, did "not have the probative value" the KDOR contended. As discussed earlier, the court examined Rita's domicile. The court listened to the testimony from members of Gene's community and found that their testimony showed that Gene resided in Florida during the assessment period. The court addressed Gene's church practices and held that the Bicknells' delay in formally joining a Florida church until 2012 did not preclude them from being Kansas residents. While examining the evidence relevant to K.A.R. 92-12-4a(b)(7)(E)—the location of services performed by the person in the course of employment—the court discussed Gene's business involvement in Kansas. The court found while "[t]here was testimony establishing that Gene would provide the services by teleconference from Florida . . . the issue is not the location of the person but the services. This factor can be seen as weighing in favor of Kansas domicile."

It is evident that the district court examined the evidence the KDOR now asserts that it refused to consider. The KDOR's true problem is with the weight the district court assigned to the evidence. But this court does not reweigh the evidence or pass on the credibility of witnesses. *Wolfe Electric, Inc. v. Duckworth*, 293 Kan. 375, 407, 266 P.3d 516 (2011). The KDOR has thus failed to show that the district court erred in applying Kansas law on domicile.

VI.    THE DISTRICT COURT'S OPINION DID NOT FAIL TO SET FORTH FINDINGS OF FACT AND LAW

The KDOR's next argument focuses on the format of the district court's opinion. The KDOR asserts that the district court committed a prejudicial error by organizing its opinion around the K.A.R. 92-12-4a(b)(7) factors for three reasons:  (1) the court applied the factors as a "formula for determining domicile" rather than decide based on the facts of the case; (2) the district court disregarded this court's instruction in *In re Bicknell*, No. 111,202, 2015 WL 5613069 (Kan. App. 2015) (unpublished opinion) (*Bicknell II*), to consider the regulation along with controlling statutory and caselaw; and (3) the court's comingling of factual findings with conclusions of law violated K.S.A. 2020 Supp. 60-252(a)(1) which requires the court to "find the facts specially and state its conclusions of law separately."

A district court's interpretation and application of the law is subject to unlimited review. *Johnson*, 281 Kan. 1212, Syl. ¶ 2; see *Gannon v. State*, 305 Kan. 850, 874, 390 P.3d 461 (2017) (determining a district court's duties under K.S.A. 2016 Supp. 60-252 is a question of law subject to unlimited review).

I will address the KDOR's first two arguments together as they share the same foundational premise:  that the district court did not properly apply the law by focusing

on the K.A.R. 92-12-4a(b)(7) factors to the exclusion of all else. A review of the court's decision shows that this is not the case. The court recognized that *Bicknell II* directed it to apply not only K.A.R. 92-12-4a, but also K.A.R. 92-12-4 (2006), controlling statutory law, and caselaw. In fact, the first substantive issue the court addressed was not the subsection (b)(7) factors, but whether Gene had the requisite intent to be domiciled in Florida. This portion of the court's analysis contained many citations to Kansas caselaw. In addition, the definition of domicile is very similar in both regulations. See K.A.R. 92-12-4(a) (2006) ("'Domicile' shall mean that place where a person resides, where the person has an intention to remain, and to which the person intends to return following any absence."); K.A.R. 92-12-4a(b)(1) ("'domicile' shall mean that place in which a person's habitation is fixed, without any present intention of removal, and to which, whenever absent, that person intends to return"). The court did not begin its discussion of the subsection (b)(7) factors until nearly halfway through its opinion. And, prior to addressing the factors, the court said that its analysis would incorporate the previous regulation (K.A.R. 92-12-4 [2006]), statutory law, and caselaw. The court explained:

> "Both regulations are generally consistent with each other and with statutory and common law. The difference in definitions was a difference in emphasis not qualification. . . . The three factors which the previous regulation stated 'shall' be considered as evidence are all factors which may be considered under the newer version. The mandate of the COA includes consideration of all appropriate statutory and case law. Provision for such consideration is included in (b)(7)(S) which allows any other appropriate consideration, a convenient opportunity for full compliance with the COA mandate."

The KDOR also suggests that the district court violated the rule set forth in *Peck v. University Residence Committee of Kansas State University*, 248 Kan. 450, 464, 807 P.2d 652 (1991), in which the Kansas Supreme Court found that a domicile determination "is not subject to a formula, but depends upon the facts of each case." This argument is

unpersuasive, as the district court's decision to structure its opinion around the regulatory factors was merely an organizational tool. It is clear from the court's decision that it considered the facts of the case and did not limit its analysis to some formulaic application of K.A.R. 92-12-4a.

The last argument the KDOR makes here is that the district court failed to adhere to K.S.A. 2020 Supp. 60-252(a)(1). This statute provides that "[i]n an action tried on the facts without a jury . . . the court must find the facts specially and state its conclusions of law separately." K.S.A. 2020 Supp. 60-252(a)(1). The district court's opinion does contain substantial factual findings, as well as legal conclusions. But the KDOR complains that the factual findings were improperly comingled with the legal conclusions.

It is unnecessary to determine whether the district court complied with K.S.A. 2020 Supp. 60-252(a)(1) because even if the district court did violate the statute there would be no cause to remand. Litigants generally "must object to inadequate findings of fact and conclusions of law in order to give the trial court the opportunity to correct them." *In re Guardianship and Conservatorship of B.H.*, 309 Kan. 1097, 1107-08, 442 P.3d 457 (2019). If there is no objection, this court may "presume[] the district court found all facts necessary to support its judgment, although this court may nevertheless order a remand if the lack of specific findings precludes meaningful review." 309 Kan. at 1108. Here, the KDOR did not object below and the district court made ample factual findings, so meaningful review of the decision is not precluded.

VII.    THE DISTRICT COURT'S DECISION WAS SUPPORTED BY SUBSTANTIAL EVIDENCE

The KDOR argues that the district court's decision was not supported by the evidence. The KDOR also asserts that the district court rejected "the existence of basic

86

underlying facts" and that "[v]irtually every sentence" in the court's factual findings "is erroneous in some material respect, so many they cannot all be addressed."

When a party challenges a verdict or district court decision for insufficiency of the evidence or as conflicting with the evidence, an appellate court does not reweigh the evidence or pass on the credibility of the witnesses. If the evidence, when considered in the light most favorable to the prevailing party, supports the verdict, we will not disturb the verdict or decision on appeal. *Wolfe Electric, Inc.*, 293 Kan. at 407.

I will review the findings made by the district court which are specifically disputed by the KDOR, based on the relevant provisions of K.A.R. 92-12-4a(b)(7).

A. *"The percentage of time that the person is physically present within the state of Kansas and the percentage of time that the person is physically present in each jurisdiction other than the state of Kansas." K.A.R. 92-12-4a(b)(7)(A).*

While analyzing K.A.R. 92-12-4a(b)(7)(A) ("The percentage of time that the person is physically present within the state of Kansas and the percentage of time that the person is physically present in each jurisdiction other than the state of Kansas."), the district court stated in part:

"The only reliable evidence regarding the amount of time Gene spent in any particular state comes from the recollections of those people directly involved in knowledge of Gene's whereabouts. This is limited to Gene's personal assistant, his wife, and to a lesser extent a second tier of people like his son, Cindy Morris, etc. KDOR has no evidence."

The district court did not directly refer to the response in the nonresident questionnaire listing the days Gene reported he was physically present in Kansas and

87

Florida. But the district court did state that it was "not satisfied that any estimates by anyone other than those who would have been contemporaneously familiar with Gene's whereabouts on a day-to-day basis are accurate or worthy of serious weight or consideration."

Ms. Cook completed the nonresident questionnaire. When Marty delegated the task of responding to the questionnaire to Ms. Cook, she had only known the Bicknells for about a year. It was not error for the district court to place more weight on the testimony of people who knew Gene better and were more involved in his life. It is within the province of the district court to make credibility determinations when parties present conflicting evidence, and this court will not disturb those decisions. *Wolfe Electric, Inc.*, 293 Kan. at 407.

Still, the KDOR argues that it "presented abundant evidence," including Gene's Florida and Kansas country club records, Gene's W-2s which were mailed to his Kansas address, testimony from Gene's friends that he did not retire, and Gene's testimony that he was regularly present in church and at business meetings in Pittsburg. For the district court to say that the KDOR presented no evidence, the KDOR argues, "[I]s arbitrary and capricious and disregards basic, underlying facts."

The district court did not say that the KDOR presented no evidence, it stated that the KDOR did not present *reliable* evidence of Gene's physical presence. And elsewhere in its opinion, the district court did make findings on many things the KDOR asserts it ignored. The court discussed Gene's country club memberships, evidence of where Gene received mail, and Gene's attendance at church and other meetings in Pittsburg.

The testimony, including testimony from Gene, Rita, Marty, Badart, Morris, and Gene's friends and associates, was consistent that Gene's physical presence in Kansas

88

began to diminish in early 2000, and by 2003 he was living in Florida. While Gene may have visited Pittsburg, he would only do so if there were a reason to be there such as a meeting or family event. Otherwise, he would be in Branson or Florida. For these reasons, the district court's findings on this factor were supported by substantial evidence.

B. *"[T]he location of the person's domicile for prior years." K.A.R. 92-12-4a(b)(7)(B).*

The KDOR also objects to the district court's findings under K.A.R. 92-12-4a(b)(7)(B) (the location of Gene's domicile for prior years). The KDOR isolates a statement made by the district court—that "Kansas had been [Gene's] previous domicile for only a short period"—and argues that this is untrue and violates the parties' stipulation that Gene was domiciled in Kansas before 2003.

The district court's statement makes sense in context. In this portion of its opinion, the court found that Gene was domiciled in Florida in 1999 but reverted to a Kansas domicile by the end of 2000. Then, in 2003, Gene once again became domiciled in Florida. The three-year period in Kansas is the "short period" to which the court referred. There is no indication that the court found that Gene was not domiciled in Kansas before 1999. Further, and as discussed above, this finding does not violate a stipulation because parties cannot stipulate to legal conclusions.

C. *"[T]he location at which the person votes or is registered to vote," and "the jurisdiction in which the person has been issued a valid driver's license." K.A.R. 92-12-4a(b)(7)(C); K.A.R. 92-12-4a(b)(7)(I).*

Next, the KDOR challenges the district court's statement that "Gene consistently registered to vote wherever he intended his domicile to be and with his registration

89

having been reestablished in Florida in 2004 this factor weighs in his favor." This statement was error, the KDOR asserts, because registering to vote or obtaining a driver's license "is not, in itself, proof of residence." And the KDOR says that because Gene's domicile has always been Kansas, "[H]is Florida voter registration and driver's license were invalid and without probative value."

The district court properly considered the locations in which Gene registered to vote and maintained a driver's license. Kansas regulations specifically provide that the court may consider these factors. K.A.R. 92-12-4a(b)(7)(C); K.A.R. 92-12-4a(b)(7)(I). In fact, K.A.R. 92-12-4(c) (2006), which the district court was also required to consider under the directions of *Bicknell II*, had a similar requirement ("A voting residence shall constitute evidence of domicile. The state where an individual's driver's license is issued and the state where an individual's vehicle is registered shall constitute evidence of domicile."). See *Bicknell II*, 2015 WL 5613069, at *10.

Gene had a consistent pattern of obtaining a driver's license and registering to vote in the state in which he intended to live. He did this when he first decided to live in Florida in 1999. When he decided to return to Kansas to address unfinished business, he got a Kansas driver's license and registered to vote there in December 2000. In January 2003, the month in which Gene asserts his residency changed back to Florida, he obtained a duplicate of his prior Florida driver's license. The only aberration in this pattern of behavior occurred in August 2004 when Gene renewed his Kansas driver's license. But Gene explained that he did this in response to a renewal notice sent by the state and not because he had any intention of living in Kansas.

Overall, Gene's actions in registering to vote and obtaining driver's licenses align with his stated intent to live in either Florida or Kansas and add credibility to Gene's assertion that he was living in those states. The district court did not err in considering

90

this. And there is no indication that the district court found the facts of Gene's voter registration or driver's license to be controlling in deciding the issue of Gene's residency. While the evidence supported the district court's conclusion, it was not the sole evidence upon which the court relied.

### D. "[T]he person's ownership of other real property." K.A.R. 92-12-4a(b)(7)(H).

The KDOR next argues that the district court did not properly consider Gene's ownership of real property in Kansas, specifically his farm holdings and his ownership of "business and industrial property through corporations or limited liability companies in Kansas." The KDOR asserts that Gene's Florida property was merely a seasonal residence and that his ownership of that property had "no probative value of a new residence in Florida."

The district court's analysis of K.A.R. 92-12-4a(b)(7)(H), "[T]he person's ownership of other real property," was brief. The court noted that there was no specific evidence on the value of the Pittsburg home, but that the Florida home was far more valuable. The court did not mention any business property owned by Gene, although the record does not appear to contain evidence of the value of any such property. The court did note that the KDOR wanted it to place weight on Gene's ownership of land for farming and cattle. But, given Gene's minimal involvement in the farm the ownership of that property was not "particularly significant." The court determined that the factor weighed "slightly in favor of Florida domicile."

The relative values of the properties did not seem to heavily influence the district court's ultimate decision—the court's focus was on Gene's intent and physical presence. The only time the court mentioned the values was in its analysis of the K.A.R. 92-12-4a(b)(7) factors. The KDOR is essentially inviting this court to reweigh the evidence,

which this court cannot do. The court's findings on the value of the Florida home and Gene's minimal participation in his farm are supported by the record. The court did not ignore the evidence, it simply assigned a different weight to the evidence than the KDOR wanted.

E.  *"[T]he location of services performed by the person in the course of employment." K.A.R. 92-12-4a(b)(7)(E).*

"[T]he location of services performed by the person in the course of employment" is one factor courts may consider under K.A.R. 92-12-4a(b)(7)(E). The district court noted that Gene's business activities were mostly focused in Kansas but that Gene provided services by teleconference from Florida. Still, the court thought the focus of the analysis was not the location of the person (Florida) but the location of the services (Kansas). As a result, the court weighed this factor in favor of Kansas domicile.

The KDOR now argues that the district court missed the point, and that Gene's work in Kansas meant he had not retired in Florida "for health and personal reasons" as he stated in response to one of the KDOR's interrogatories. The KDOR asserts that "[w]hether and when Gene stopped working and retired in Florida was the key issue regarding both his physical presence and domiciliary intent." The KDOR notes that Gene did not have a retirement party or otherwise announce his retirement. But Gene explained that he did not make an announcement since the people he interacted with knew that he retired to Florida in January 2003. The KDOR also cites testimony from several witnesses that Gene did not retire. For example, Mr. Cook testified that he did not think Gene had retired because "he doesn't have it in him." It seems that one reason Mr. Cook did not think that Gene retired was because he was working on his theatrical production in Branson. While Mr. Cook and Gene clearly have different definitions of retirement, Mr. Cook's testimony does not establish that Gene was physically present in Kansas or

that he was not physically present in Florida. Evidence from other witnesses lies in a similar vein. Gene's insurance agent and friend said in a deposition that he did not see Gene slow down. Another friend testified that Gene was a "pusher" and agreed that Gene was a "workaholic." This testimony is consistent with the district court's finding that Gene spent a lot of time in Missouri producing and performing in Celebrate America. And Gene was not required to retire to be physically present in Florida.

The KDOR's emphasis on whether Gene retired is misplaced. Retirement and Florida residency are not exclusive. People have different definitions of retirement, and some may not consider performing full time at a Branson theater to be retirement. What is more, and as the district court found, the evidence shows that Gene could conduct business remotely. Gene did not have to be in a specific location to review documents, prepare for meetings, or conduct business by phone or computer. Throughout the case, the KDOR placed significant emphasis on the single statement that Gene retired to Florida "for health and personal reasons." The KDOR expends a lot of energy trying to prove that Gene was not retired because his friends did not think he retired and because he was still earning income from Kansas businesses. At best, evidence that Gene had not retired would affect his credibility. This court cannot reassess witness credibility. *Wolfe Electric, Inc.*, 293 Kan. at 407. Even if he had not retired, the evidence did not show that Gene had to be physically present in Kansas to complete his job duties. Whether Gene retired is not the issue in this case. The issue is whether Gene was physically present in Florida and held an intent to remain there permanently or indefinitely, and the court determines this issue by looking at Gene's course of conduct. See *Estate of Schoof v. Schoof*, 193 Kan. 611, 614, 396 P.2d 329 (1964); *In re Estate of Phillips*, 4 Kan. App. 2d 256, Syl. ¶ 6.

*F. "[T]he filing by the person of a Kansas tax return, report, or application as a Kansas resident or a nonresident individual." K.A.R. 92-12-4a(b)(7)(L).*

Another factor the district court considered in its analysis was K.A.R. 92-12-4a(b)(7)(L)—"the filing by the person of a Kansas tax return, report, or application as a Kansas resident or a nonresident individual." The court reviewed how Gene filed his taxes as a Kansas resident in 2000 and 2001 but declared himself a nonresident from 2003 onward (the court did not mention 2002). Gene also paid a Florida intangible property tax for each year of the assessment period, "[A] tax he did not owe unless he was a Florida resident." The court found that this factor weighed heavily in favor of finding that Florida was Gene's domicile during the assessment period.

The KDOR's problem with the district court's findings on this issue is much like its issue with the district court's reliance on Gene's voter registration and driver's license possession. The KDOR asserts that the evidence had no probative value because "Gene's tax filings merely indicated where he *wished* to be taxed." The KDOR then suggests that Gene only filed as a Florida resident to avoid paying Kansas income taxes.

It was appropriate for the district court to consider evidence of where Gene filed his taxes and is explicitly authorized by K.A.R. 92-12-4a(b)(7)(L). This evidence, like the evidence of Gene's voter registration and driver's license, corroborates Gene's stated intention of domicile. The district court's factual findings on this point are sound and not "riddled with legal error and misstatements of fact" as the KDOR contends.

G. *"[T]he location where the person, the person's spouse, or the person's minor children regularly participate in sporting events, group activities, or public performances." K.A.R. 92-12-4a(b)(7)(R).*

The KDOR's next argument focuses on the way the district court addressed the Bicknells' church membership. Gene testified that church was very important to him. Even so, he and Rita did not join a church in Florida until after 2012. Gene explained that they were still going to church, but they could not "find a church that [they] were really comfortable in." On this point, the district court stated: "It is within the common knowledge and understanding of a Christian that a home church is a personal and intimate decision and the fact they were unable to locate a suitable substitute home church until 2012 certainly does not indicate they were not residents of Florida prior to 2012."

The KDOR objects to the district court's reliance on "'common knowledge'" of Christians. Citing the Bible, the KDOR asserts that "Christians believe other Christians generally are 'suitable' to associate with (Galatians 3:28; Matt. 22:39). They do not see the faith as insular but seek out membership in a local church as the first thing to do upon moving to a new community, not the last thing." The KDOR also asserts, citing the website for American Baptist Churches USA, that "Christian churches generally, and the Baptist convention of Gene's local church in Pittsburg specifically, consider membership in a local church an essential and fundamental expression of faith and commitment to the body of Christ." The KDOR argues that the Bicknells' failure to join a Florida church until after 2012 was "compelling evidence" that they did not live there.

It is neither necessary nor proper for a court or the KDOR to define what a Christian is and how a Christian is supposed to act. See *City of Boerne v. Flores*, 521 U.S. 507, 513, 117 S. Ct. 2157, 138 L. Ed. 2d 624 (1997) ("it 'is not within the judicial

95

ken to question the centrality of particular beliefs or practices to a faith, or the validity of particular litigants' interpretations of those creeds'"). Only the facts of the case matter. The parties suggested different reasons for Gene's failure to quickly join a Florida church. The KDOR asserts it was because Gene was living in Kansas. Gene asserts it was because it took him and Rita a long time to find one in which they were comfortable. Gene was not regularly attending services at his Pittsburg church during this time, although he did continue his financial support. But see K.A.R. 92-12-4a(b)(8) ("The following factors shall not be considered in determining whether or not a person is domiciled in Kansas:  [A] The location of any organization to which the person makes charitable contributions.").

There are multiple possibilities why Gene did not immediately join a Florida church, and the failure to join a Florida church immediately does not compel the conclusion that Gene was domiciled in Kansas. The district court could credit the Bicknells' testimony on this point.

H. *"[A]ny other fact relevant to the determination of that person's domicile." K.A.R. 92-12-4a(b)(7)(S).*

The KDOR's final evidentiary argument is that the district court erred by relying on Gene's testimony. The KDOR attacks Gene's testimony as self-serving, meaningless, and full of contradictions.

First, the KDOR asserts that Gene's testimony was "meaningless and without probative value" because it followed his own private theory that he only had to do five things to become a Florida resident. As discussed above, the district court did not rely only on "Gene's law" as the KDOR calls it. The court did not find that Gene was a Florida resident based solely on Gene's word. Gene testified about much more than the

96

private theory he had about how to change residency. He testified about where he was physically present, and where he intended to return when he was done with his shows in Branson. Moreover, under *Bicknell II*, 2015 WL 5613069, at \*10, the court was also required to consider K.A.R. 92-12-4(b) (2006), which states:

> "To constitute a change in domicile, there shall be intent to change, actual removal, and the acquisition of a new domicile. The domicile shall not be changed by removal for a definite period or for particular purposes nor by abandonment of the old domicile until the acquisition of a new one is effected."

This regulation places Gene's subjective intent and details regarding his physical presence from one state to another front and center.

The KDOR also discounts Gene's testimony because it disagrees with his assertion that he was retired. As explained, whether or not Gene was retired is not the issue in this case. The issue is where Gene was domiciled during the assessment period. This argument is unpersuasive.

Second, the KDOR asserts that "Gene's testimony was devoted primarily to citing and authenticating the documents and occasions on which he had used Englewood, Florida as his address in a document or other self-serving declarations." Self-serving declarations alone, the KDOR argues, are not substantial evidence. The KDOR grossly mischaracterizes Gene's testimony. Gene's testimony went far beyond authenticating documents. He testified over three days and his testimony covered many topics, including his personal history, business involvement, relationship with Rita, thoughts, intentions, and hobbies. Nor did the court rely only on Gene's testimony; it also considered testimony from Gene's family, friends, business associates, and other witnesses.

Third, the KDOR argues that "Gene cannot carry his burden of proof by disputing himself." The KDOR is referencing a few things here. First, Gene's responses to the nonresident questionnaire in 2007, in which he represented that he spent over 100 days in both Kansas and Florida during each year of the assessment period. The KDOR is also referencing the many business and legal documents in which Gene's address was listed as a Kansas address.

Litigants are not prohibited from providing contradictory evidence. That said, that does not mean there are not consequences for doing so. Inconsistent testimony may impact witness credibility. The district court found that Gene's testimony regarding his physical presence was more compelling evidence than the information in the nonresident questionnaire or the admissions of his agents. The district court could determine issues of fact anew. K.S.A. 74-2426(c)(4)(B).

The district court's conclusion was not unreasonable. Although Gene served as a resident agent for multiple companies, he testified that he did not even know what a resident agent was until the trial. It was his business practice to have his assistants handle those matters. There is no evidence that Gene purposefully directed his assistants to state that he was a Kansas resident for the purpose of the business filings. The same is true for the nonresident questionnaire. Rather than provide the requested information himself, Gene had someone who had only known the Bicknells for about a year (Ms. Cook) fill out the information. Badart signed it at Gene's direction, but neither Gene nor Rita confirmed that the information in it was accurate.

Understandably, the KDOR is frustrated that Gene provided them with information that he now claims is incorrect. The KDOR provided Gene a chance to share his story, and rather than answer the KDOR's questions, Gene asked other people to try to guess at his whereabouts during the assessment period. Still, the appropriate remedy for

98

Gene's failure is not to find that he was a resident of Kansas. As the KDOR notes in its brief, Gene signed the nonresident questionnaire under penalty of perjury. But this is not a perjury proceeding, and the discrepancies in Gene's evidence do not require this court to rule against him.

The KDOR also relies on agency theory in its argument. Agency is a relationship that arises when one person, a principal, manifests to another person, an agent, that the agent should act on the principal's behalf and be subject to the principal's control. When an agent acts with the principal's authority, the legal consequences of the act are attributable to the principal. *Golden Rule Ins. Co. v. Tomlinson*, 300 Kan. 944, 955, 335 P.3d 1178 (2014). The KDOR argues that Badart and Morris were Gene's agents, and that when they signed legal documents on his behalf listing his Pittsburg address as his residence Gene was bound by that admission.

While it may be true that Morris and Badart often acted as Gene's agents, nothing in Kansas' domicile law provides that an agent's representation about the principal's residence is binding on the courts. A person's formal declarations, such as in legal documents, are certainly evidence in domicile cases. But "'[a]ctions speak louder than words, and the courts rely most heavily upon them.'" *In re Estate of Phillips*, 4 Kan. App. at 263. The district court was within its right in assigning this evidence little weight. This evidence may have contradicted with Gene's testimony that he was a Florida resident, but appellate courts do not reweigh evidence, resolve evidentiary conflicts, or make witness credibility determinations. *State v. Chandler*, 307 Kan. 657, 668, 414 P.3d 713 (2018).

In sum, I would affirm the extremely thorough and well-researched opinion by Senior Judge Smith. During eight days of trial, he heard and weighed evidence from both Gene and the KDOR. He fully complied with this court's mandate in *Bicknell II*. Judge Smith allowed each side to fully present its case. Judge Smith could weigh the credibility

of witnesses who testified before him. His opinion extensively discusses the reasons for his decision and the facts and law that support it. I find he committed no reversible error. There is no need to delay this case any further and suggest that another judge could do a better job.